Checkpoint Contents

Pension & Benefits Library

West Employee Benefits Cases

2016

District Court/Bankruptcy Court

February

02/19/2016

02/19/2016, United States District Court, S.D. Texas, Houston Division., Ariana M., Plaintiff, v. Humana Health Plan of Texas, Inc., Defendant., 2016 WL 690582

**West Employee Benefits Cases**

# Ariana M., Plaintiff, v. Humana Health Plan of Texas, Inc., Defendant., 02/19/2016

ARIANA M. v. HUMANA HEALTH PLAN OF TEXAS INC.

**Docket:** H-14-3206

**Cite:** 2016 WL 690582

**Court:** United States District Court, S.D. Texas, Houston Division.

**Date:** 02/19/2016

# Counsel

Signed

James C. Plummer, Amar Bharat Raval, Plummer Kuykendall, Houston, TX, Lisa S. Kantor, Kanto Kanto, LLP, Elizabeth K. Green, Kantor & Kantor LLP, Northridge, CA, for Plaintiff.

Carlos R. Soltero, Ellen Burkholder Cochran, Rachael K. Padgett, McGinnis Lochridge et al., Austin, TX, for Defendant.

# MEMORANDUM AND OPINION

**Judge:** Lee H. Rosenthal, United States District Judge

**[\*pg. 1]** This is an ERISA case challenging the denial of benefits under a group health plan insured and administered by Humana Health Plan of Texas, Inc. (" Humana"). Ariana M., a dependent eligible for benefits under the plan, sued Humana under **29 U.S.C. § 1132(a)(1)(B)** after it terminated payments

for her partial hospitalization treatment. Humana moved for summary judgment on the grounds that: Ariana M.'s adverse determination for preauthorization of treatment and claims for benefits was reasonable and based on substantial evidence; even under a *de novo* review, Ariana M.'s condition did not satisfy the medical-necessity criteria required to continue partial hospitalization treatment; and Ariana M.'s claims were fully and fairly reviewed by board-certified psychiatrists and Humana complied with ERISA procedural requirements. (Docket Entry No. 39). Ariana M. responded and sought summary judgment in her favor on the grounds that: the denial was improper even under an abuse-of-discretion standard of review; Ariana M.'s treatment met the medical-necessity criteria; and the record failed to support Humana's decision to deny benefits. (Docket Entry No. 44).

Based on the pleadings, the parties' arguments and submissions, the administrative record, and the applicable law, this court grants Humana's motion for summary judgment and denies Ariana M.'s motion. Final judgment is entered by separate order. The reasons are explained below.

## I. Background

Ariana M. is a 19-year-old female who suffers from an eating disorder and depression. From April 15, 2013 to June 4, 2013, Humana authorized and paid for partial hospitalization treatment at Avalon Hills Treatment Center in Logan, Utah. Humana denied benefits on June 5, 2013, after finding that the treatment was no longer medically necessary.

The plan defines "medically necessary" to mean:

ealth care services that a *health care practitioner* exercising prudent clinical judgment would provide to his or her patient for the purpose of preventing, evaluating, diagnosing or treating an *illness* or *bodily injury*, or its symptoms. Such health care service must be:

- In accordance with nationally recognized standards of medical practice;
- Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's *illness* or bodily *injury*;
- Not primarily for the convenience of the patient, physician or other health care provider; and
- Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's *sickness* or *bodily injury*

For the purpose of *medically necessary*, generally accepted standards of medical practice means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the view of physicians practicing in relevant clinical areas and any other relevant factors.

[*pg. 2] (Administrative Record at 877). The plan uses a set of clinical standards-the "Mihalik criteria"-to assess medical necessity. In Ariana M.'s case, eight of these criteria must be present "throughout the

episode of care" to make the services medically necessary:

PM.A.g.1. The services must be consistent with nationally accepted standards of medical practice.

PM.A.g.2. The services must be individualized, specific, and consistent with the individual's signs, symptoms, history, and diagnosis.

PM.A.g.3. The services must be reasonably expected to help restore or maintain the individual's health, improve or prevent deterioration of the individual's behavioral disorder or condition, or delay progression in a clinically meaningful way of a behavioral health disorder or condition characterized by a progressively deteriorating course when that disorder or condition is the focus of treatment for this episode of care.

PM.A.g.4. The individual complies with the essential elements of treatment.

PM.A.g.5. The services are not primarily for the convenience of the individual, provider, or another party.

PM.A.g.6. Services are not being sought as a way to potentially avoid legal proceedings, incarceration, or other legal consequences.

PM.A.g.7. The services are not predominantly domiciliary or custodial.

PM.A.g.8. No exclusionary criteria of the health plan or benefit package are met.

(*Id.* at 1566).

The following set of criteria must be satisfied to initiate treatment:

PM.A.i.1. Based on a behavioral health history and mental status evaluation completed by a psychiatrist or by a behavioral health professional licensed, certified, or registered to practice independently and reviewed by a psychiatrist prior to initiation of treatment, the individual is diagnosed as having, or there is strong presumptive evidence that the individual has a diagnosis of, a mental disorder or condition according to the most recent version of the *Diagnostic and Statistical Manual of Mental Disorders* that requires, and is likely to respond to, professional therapeutic intervention.

PM.A.i.2. A concurrent medical assessment does not indicate that a non-behavioral medical condition is primarily responsible for the symptoms or behaviors necessitating treatment in this setting.

PM.A.i.3. The individual does not have adequate internal resources or an adequate external support system to maintain functioning without the support of an intensive multi-modal, multi-disciplinary treatment program that includes medical and/or nursing care.

PM.A.i.4. With treatment at this level, the individual is capable of controlling behaviors and/or seeking professional help when not in a structured treatment setting.

PM.A.i.5. If the services being proposed have been attempted previously without significant therapeutic benefit, there is a clinically credible rationale for why those same services could be effective now.

PM.A.i.6. The place of service meets the Service Setting Criteria for Partial Hospital Treatment: Mental Health as described on page 29.

One of the following Treatment Initiation Criteria is also required.

PM.A.i.7. As a result of the mental disorder or condition, the individual is now a clear and present danger to self, a clear and present danger to others, or unable to provide for basic self-care needs resulting in impending, serious self-harm.

**[\*pg. 3]** PM.A.i.8. As a result of the mental disorder or condition:

PM.A.i.8.1. The individual demonstrates significant impairment in social, occupational, scholastic or role functioning that represents a deterioration in level of functioning.

AND

PM.A.i.8.2. The individual has participated in and failed a substantial course of traditional or intensive outpatient treatment in the past three months.

OR

PM.A.i.8.3. It is clinically probable that the individual will require initiation of a higher level of care if services are not provided at this level.

(*Id.* at 1566-67).

These criteria must be satisfied to continue treatment:

PM.A.c.1. The individual continues to meet the treatment initiation criteria each day that services are provided at this level.

PM.A.c.2. There is an individualized plan of active, professionally directed treatment that specifies the goals, interventions, time frames, and anticipated outcomes appropriate to:

PM.A.c.2.1. Improve or prevent deterioration or delay progression in a clinically meaningful way of the symptoms of, or impairment in functioning resulting from, the mental disorder or condition that necessitated initiation of treatment.

AND

PM.A.c.2.2. Address a co-morbid substance use disorder or condition, if one exists.

(*Id.*).

umana denied benefits for continued partial hospitalization treatment, after a medical review by Dr. Manjeshwar Prabhu, a board-certified psychiatrist and contract physician with Humana's behavioral-health vendor, LifeSynch. Dr. Prabhu examined Ariana M.'s medical files and consulted with her therapist at Avalon Hills in a peer-to-peer review. (*Id.* at 324-28). Avalon Hills told Dr. Prabhu that Ariana M. was not "progressing in treatment; she appears to be at her baseline behaviors." (*Id.* at 326). She was not "[suicidal], [homicidal], or psychotic," and she had "no complications with her eating disorder." (*Id.*). Dr. Prabhu concluded that Ariana M. did not qualify for continued treatment under the Mihalik criteria. Dr. Prabhu cited criterion PM.A.c.1, which requires that the patient meet the "treatment initiation criteria" each day to continue receiving benefits. Dr. Prabhu found that Ariana M. was not "in imminent danger to [herself] or others," as required by criterion PM.A.i.7. Her clinical records did not show "medical instability" or "functional impairments," as required by PM.A.i.8.1. And Ariana M. could be safely treated at a lower level of care, such as an intensive outpatient program. Criterion PM.A.i.8.3 requires a "clinical[ ] probab[ility] that the individual will require initiation of a higher level of care if services are not provided at this level." Dr. Prabhu reported that continuing the treatment after June 4, 2013, was not medically necessary. Humana denied coverage for continued treatment and provided Ariana M. and Avalon Hills with a notice and explanation of the denial the same day. (*Id.* at 329-48).

Avalon Hills appealed. Ariana M.'s claim was reviewed by Dr. Neil Hartman, a board-certified psychiatrist with a third-party review company, Advanced Medical Reviews. Dr. Hartman consulted with Ariana M's treating physician and reviewed the medical records, including Dr. Prabhu's benefits denial. Relying on the Mihalik criteria, Dr. Hartman also concluded that Ariana M. did "not meet medical necessity for partial hospital treatment," that she was "not a danger to [herself or others]," and that she was "medically stable and not aggressive." (*Id.* at 367). Dr. Hartman reported his conclusion on June 10, 2013. Humana sent a notice and explanation of the denial to Ariana M. and to Avalon Hills on June 12. (*Id.* at 375-97).

[*pg. 4] Ariana M. remained at Avalon Hills until September 18, 2013. (Docket Entry No. 1 at p. 5). She sues for the cost of her treatment from June 5 to September 18, 2013.

## II. The Standard of Review

Congress enacted ERISA " "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." " *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830(2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113(1989)). ERISA applies to an employee benefit plan established or maintained by an employer engaged in commerce or in any industry or activity affecting commerce. **29 U.S.C. § 1003(a)** An administrator must act "in accordance with the documents and instruments governing the plan." **29 U.S.C. § 1104(a)(1)(D)** ; *see Pegram v. Herdrich*, 530 U.S. 211, 223(2000) (discussing the various documents that constitute an ERISA plan). Section 502(a)(1)(B) of ERISA allows a participant in, or beneficiary of, a covered plan to seek judicial review of a denied claim "to recover benefits due to him under the terms of his plan." **29**

U.S.C. § 1132(a)(1)(B)

## A. Whether the Benefits Determination Involved the Plan Terms or Factual Findings

In an ERISA case, the plan administrator's benefit determinations can be divided into two categories: interpreting the plan terms and determining the facts underlying the benefit claim. A court reviews a plan administrator's construction of plan terms *de novo* unless the plan contains an express grant of discretionary authority. If so, those decisions are reviewed for abuse of discretion. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210(2004) (quoting *Bruch* 489 U.S. at 115). The parties agree that *de novo* review is the correct standard here. (Docket Entry No. 20). Even under *de novo* review of plan-term construction, however, a plan administrator's factual findings are reviewed for abuse of discretion. *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). Whether treatment is "medically necessary" is a factual finding. *Id.* at 214. The question is whether Humana abused its discretion by finding that Ariana M.'s continued partial hospitalization treatment after June 4, 2013 at Avalon Hills was not medically necessary.

A court applying the abuse of discretion standard analyzes "whether the plan administrator acted arbitrarily or capriciously." *Id.* (quotation marks omitted). An administrator's decision to deny benefits must "be based on evidence, even if disputable, that clearly supports the basis for its denial." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999) (en banc), *overruled on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105(2008). A decision is not arbitrary and capricious if it is supported by substantial evidence. *Meditrust*, 168 F.3d at 215 "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 511 (5th Cir. 2010) (quotation marks omitted). A decision is arbitrary when it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust*, 168 F.3d at 215 (quotation marks omitted).

[\*pg. 5] "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness-even if on the low end." *Holland v. Int'l Paper Co. Ret. Plan* , 576 F.3d 240, 247 (5th Cir. 2009) (quotation marks omitted). If the plan administrator's decision is "supported by substantial evidence and is not arbitrary or capricious, it must prevail." *Ellis v. Liberty Life Assur. Co.*, 394 F.3d 262, 273 (5th Cir. 2004).

## B. Whether There Was a Conflict of Interest

An ERISA plaintiff asserting a conflict of interest must come forward with evidence of the existence and extent of the conflict. *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 263 (5th Cir. 2011). The

record shows the existence of a conflict here. "[A] third-party insurer's dual role as a claims administrator and plan funder gives rise to a conflict of interest that is pertinent in reviewing claims decisions." *Glenn*, 554 U.S. at 119 (Roberts, C.J., concurring). Humana is a third-party insurer that both administers and funds the plan. There is a conflict of interest. When a plan administrator has a conflict of interest, a court considers the conflict as a factor in abuse-of-discretion review. *Id.* at 115. The issue is the extent of the conflict.

The Supreme Court explained that conflict-of-interest evidence will "prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id.* at 117. "Circumstances suggesting a higher likelihood that a plan administrator's conflict of interest affected [its] decision [also] exist...where the circumstances surrounding the determination suggest procedural unreasonableness." *Hagen v. Aetna Ins. Co.*, 808 F.3d 1022, 1027 (5th Cir. 2015). By contrast, a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117 "Quite simply, "conflicts are but one factor among many that a reviewing judge must take into account." " *Holland*, 576 F.3d at 247-48 (quoting *Glenn*, 554 U.S. at 116).

Ariana M. argues that Humana failed to take steps to reduce potential bias, resulting in increased scrutiny of its benefits-denial decision. "Absent other evidence suggesting procedural unreasonableness or warranting treatment of the conflict as a more significant factor, the mere fact that [the administrator] did not utilize any such precautions is not sufficient to justify giving [the] conflict greater weight." *Hagen*, 808 F.3d at 1030 The record undercuts Ariana M.'s argument because Humana relied on a third-party vendor to review the benefits denial, which the case law recognizes as a step to reduce bias. *See Holland*, 576 F.3d at 249 ("[A]lthough the Plan Administrator ultimately decides whether or not to award a claim, it submits applicants' records to independent medical professionals....").

Ariana M. argues that Humana's decision was procedurally unreasonable because it had a history of improperly denying her claims, because Dr. Hartman was unqualified, and because Dr. Prabhu's denial was provided to Dr. Hartman before he did his own review. "[A] reviewing court may give more weight to a conflict of interest[ ] where the circumstances surrounding the plan administrator's decision suggest procedural unreasonableness." *Truitt v. Unum Life Ins. Co.*, 729 F.3d 497, 509 (5th Cir. 2013) (quotation marks omitted). The question is "whether the method by which the plan administrator made the decision was unreasonable." *Id.* at 510 (alteration omitted) (quotation marks omitted).

[*pg. 6] Ariana M. points to record evidence that during her hospitalization at Avalon Hills, Humana denied her request for continued benefits on several occasions, but then reversed the decision and authorized benefits. (Docket Entry No. 44 at p. 8-11). She points to evidence showing that Humana

changed its denials when peer-to-peer reviews between Humana and Avalon Hills doctors revealed that further treatment was medically necessary. This evidence does not show that " Humana repeatedly denied [her] claims without reflection on the continued inaccuracy of its decisions." (*Id.* at 21). To the contrary, it shows that Humana carefully reviewed its benefits denials and reversed them when peer-to-peer reviews showed that the plan authorized the continued treatment. This evidence does not support an inference of procedural unreasonableness.

Ariana M. also argues that the conflict of interest made Dr. Hartman unqualified to review her entitlement to benefits. She has neither pointed to nor submitted evidence showing that Dr. Hartman had a conflict of interest or that his compensation depended on the number of appeals he denied. *See Holland*, 576 F.3d at 249; *see also Jurasin v. GHS Prop. & Cas. Ins. Co.*, 463 Fed.Appx. 289, 292 (5th Cir. 2014) (per curiam) ("There needs to be, for example, evidence that [the medical reviewer] had some specific stake in the outcome of [the] case, such as paying the doctors more when claims were denied." (quotation marks omitted)). Nor has Ariana M. pointed to or submitted evidence showing that either Dr. Hartman specifically or Humana generally "had a history of biased claims administration based on well-documented pattern of erroneous and arbitrary benefit denials, bad faith contract misinterpretations, and other unscrupulous tactics." *Hagen*, 808 F.3d at 1029 (quotation marks omitted). **1** Ariana M. also argues that Dr. Hartman was not qualified because he is not an eating-disorder specialist, and that Humana was procedurally unreasonable in relying on him. The record does not show any deficiency in Dr. Hartman's ability to review Ariana M.'s files, consult with her healthcare providers, and reach a coverage conclusion. He identified the specific reasons for finding that continued partial hospitalization treatment was not medically necessary. And "[s]o long as the Plan Administrator's decision is rationally related to the evidence, [the Fifth Circuit does] not require the Plan Administrator to credit a particular area of expertise when deciding on an applicant's prognosis." *Holland*, 576 F.3d at 249

Ariana M. finally contends that Humana was procedurally unreasonable when it provided Dr. Prabhu's decision to deny benefits to Dr. Hartman. ERISA requires that the review on appeal "not afford deference to the initial adverse benefit determination." 29 C.F.R. § 2560.503 -1(h)(3)(ii). Although Dr. Hartman had Dr. Prabhu's benefit determination, the record does not show that Dr. Hartman gave that determination deference.

Ariana M. cites *DeLisle v. Sun Life Assurance Co.*, 558 F.3d 440 (6th Cir. 2009), but that case provides no support. *DeLisle* involved the denial of long-term disability benefits because the claimant was not "actively at work" when she became disabled. The insurance company's attorney told several of the medical reviewers that the claimant was fired "for cause" because her employer had told the insurance company that she was fired "because she was not doing her job." The record did not show whether that was related to her disability. The court held that the attorney "gave the file reviewers incomplete and potentially prejudicial information, which should have been irrelevant to an impartial assessment of [the claimant's] ability to perform her job on a particular day." *Id.* at 445. The court noted "an increased risk of bias in the medical file review process when a conflicted plan administrator gives information to regular independent contractor-consultants that portrays the claimant in a negative light." *Id.* The

present record does not involve similar facts. Instead, the record shows that Dr. Hartman reviewed Ariana M.'s file and did a peer-to-peer review with her treating physician at Avalon Hills. There is no evidence supporting an inference that Dr. Prabhu's assessment gave Dr. Hartman "incomplete and potentially prejudicial information," or that Dr. Hartman improperly relied on Dr. Prabhu's report.

[*pg. 7] Ariana M. has not pointed to or submitted evidence of a history of biased claims administration or procedural unreasonableness. There is a conflict of interest, but the record shows that it is "not a significant factor in this case." *See Holland*, 576 F.3d at 249

## III. Applying the Standard of Review

The record shows that Humana did not abuse its discretion in finding that Ariana M.'s continued treatment at Avalon Hills was not medically necessary after June 4, 2013. Dr. Prabhu and Dr. Hartman-board-certified psychiatrists-both did peer-to-peer reviews with Ariana M.'s health-care professionals and reviewed her medical files to apply the plan's terms. They set out their decisions in written reports that cited the Mihalik criteria and explained why Ariana M. failed to meet several prerequisites for continued treatment under the plan.

Ariana M. argues that the Mihalik criteria are unreasonable and should not have been used as a nationally recognized standard of medical practice. Ariana M. argues that Humana should have used the American Psychiatric Association's criteria for treating patients with depression. She argues that the Mihalik criteria "are not a reliable basis for establishing medically necessary treatment under the policy" because they are published by a health-care consulting company that sells and licenses the criteria to insurers and because insurers can request changes to the criteria. (Docket Entry No. 44 at p. 20). This evidence does not show that the Mihalik criteria fail to represent nationally recognized medical standards or are otherwise inaccurate. And Ariana M. cites no case law to support this argument. The record shows that these criteria were developed by "physicians practicing in relevant clinical areas." (Administrative Record at 1503). The plan provides that

[f]or the purpose of medically necessary, generally accepted standards of medical practice means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the view of physicians practicing in relevant clinical areas and any other relevant factors.

Ariana M. highlights a factual error in Dr. Hartman's report. It stated that Ariana M. had not received inpatient care earlier, but she received inpatient psychiatric treatment in 2011. (Administrative Record at 132). Although this was an error, Ariana M. has not explained how it relates to, or undermines, the conclusion that her continued treatment at Avalon Hills in 2013 was not medically necessary. The error is not a basis for finding an abuse of discretion.

Ariana M. also argues that a procedural irregularity in the benefits denial supports finding that Humana

abused its discretion. ERISA regulations provide that "[i]f a group health plan has approved an ongoing course of treatment to be provided over a period of time or number of treatments," then

[a]ny reduction or termination by the plan of such course of treatment (other than by plan amendment or termination) before the end of such period of time or number of treatments shall constitute an adverse benefit determination. The plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the adverse benefit determination at a time sufficiently in advance of the reduction or termination to allow the claimant to appeal and obtain a determination on review of that adverse benefit determination before the benefit is reduced or terminated.

[*pg. 8] 29 C.F.R. § 2560.503-1(f)(2)(ii)(A). Ariana M. argues that Humana failed to comply with this provision because it denied benefits on June 5, 2013 and did not continue to provide them until she received notice of the appeal denial on June 12.

The record shows that Humana had preapproved an "ongoing course" of partial hospitalization treatment from April 15 through June 4. (Administrative Record at 330). It denied the June 5 request for preauthorization for continued partial hospitalization treatment. Humana did not "reduce" or "terminate" benefits "before the end of such period of time," that is, before June 4, and no "number of treatments" applied. Humana did not violate this ERISA procedural regulation, and there is no other basis proffered to find the date of the benefits denial arbitrary or capricious. 2

## IV. Conclusion

umana's motion for summary judgment is granted, (Docket Entry No. 39), and its motion to strike is dismissed as moot, (Docket Entry No. 47). To the extent that Ariana M. cross-moved for summary judgment, (Docket Entry No. 44), her motion is denied. Final judgment is separately entered.

## All Citations

--- F.Supp.3d ----, 2016 WL 690582

Tex.,2016

Ariana M. v. Humana Health Plan of Texas Inc.

--- F.Supp.3d ---- (Tex.)

© 2016 Thomson Reuters. No Claim to Orig. US Gov. Works.

1 Ariana M. submits deposition testimony Dr. Hartman gave in a previous action involving different

parties to support her argument. This is not competent summary-judgment evidence because depositions taken in earlier actions may only be used "in a later action involving the same subject matter between the same parties." FED. R. CIV. P. 32(a)(8); *Powertrain Inc. v. Ma*, --- Fed.Appx. ----, 2016 WL 43702, at [*pg. 2] (5th Cir. Jan. 4, 2016) (per curiam).

**2** umana also moved to strike documents Ariana M. attached to her summary-judgment response because they were outside the administrative record. (Docket Entry No. 47). Review is generally limited to the evidence before the plan administrator and contained in the administrative record, but a claimant may submit extra-record evidence to "question the completeness of the administrative record," challenge "whether the plan administrator complied with ERISA's procedural regulations," and demonstrate "the existence and extent of a conflict of interest created by a plan administrator's dual role in making benefits determinations and funding the plan." *Crosby*, 647 F.3d at 263 Humana argues that the documents Ariana M. submitted are outside the exceptions to the rule limiting review to the administrative record. Humana also argues that some of the documents are hearsay or not authenticated. Dr. Hartman's deposition testimony is not competent summary-judgment evidence. *See supra* note 1. Even with the other record evidence Ariana M. has submitted, summary judgment on her ERISA claim is warranted. The motion is dismissed as moot.

© 2018 Thomson Reuters/West

© 2018 Thomson Reuters/Tax & Accounting. All Rights Reserved.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT LONDON

| | |
|---|---|
| ALAN LITTLETON, | CIVIL ACTION NO. 6:15-187-KKC |
| **Plaintiff,** | |
| **V.** | **MEMORANDUM OPINION AND ORDER** |
| LIBERTY LIFE ASSURANCE COMPANY OF BOSTON d/b/a LIBERTY MUTUAL, | |
| **Defendant.** | |

*** *** ***

This ERISA action is before the Court on Defendant Liberty Life Assurance Company of Boston's motion for application of the arbitrary and capricious standard of review. (DE 14). For the reasons set forth below the Court will grant Defendant's motion.

**I. BACKGROUND**

This dispute involves a group disability insurance policy (the "Policy") issued by Defendant to Plaintiff Alan Littleton's employer LPC Services, Inc. to provide coverage for its group insurance plan (the "Plan"). Plaintiff obtained coverage through documents issued by his employer describing the Plan terms. Those terms made clear that claims were to be administered by Defendant. On October 28, 2015, Plaintiff filed a complaint with this Court alleging that Defendant wrongfully denied him benefits due under the Policy when it halted payments in December of 2014. (DE 1.) This Court has jurisdiction over these claims pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, which provides a mechanism for enforcing insurance policies like Plaintiff's.

This Court's January 12, 2016, scheduling order set a briefing schedule in the event that the parties could not agree on the applicable standard of review. (DE 9.) Defendant argues for the deferential arbitrary and capricious standard based on the Plan documents issued by Plaintiff's employer, which delegate discretionary authority to Defendant for administration of the claims made under the Plan. (DE 16 at 1.) Plaintiff argues for a *de novo* review relying on provisions of the Texas Insurance Code, which Plaintiff contends invalidate the Plan documents' grant of discretion. (DE 15 at 3.)

## II. ANALYSIS

Courts reviewing benefit determinations under ERISA apply a *de novo* standard unless the plan provides "the administrator or fiduciary discretionary authority to determine eligibility for benefits," in which case a "deferential standard of review [is] appropriate." *Firestone*, 489 U.S. at 111, 115. Both parties agree that the *Policy* documents do not confer discretion because, even if they sought to, any conferral of discretion contained therein would be prohibited by Texas law, and that the Texas restriction on discretionary clauses ("Texas Restriction") is saved from preemption by ERISA's savings clause. (DE 15 at 4–5; DE 16 at 1.) Likewise, there is no dispute that the language contained in the *Plan* documents would, if valid, adequately confer the discretion necessary to justify an arbitrary and capricious review standard. (DE 15 at 4.) Thus, the sole issue presented for this Court's determination is whether the Plan document's discretionary language is, like the Policy language, invalidated by the Texas Restriction.

Normally, an Administrator Defendant establishes an entitlement to deferential review by showing "that the benefit plan gives the administrator . . . discretionary authority[.]" *Firestone*, 489 U.S. at 115. However, Texas has restricted insurer's ability to obtain such deferential review through its Insurance Code; section 1701.062 provides that:

2

> (a) An insurer may not use a document described by Section 1701.002 in this state if the document contains a discretionary clause.

Tex. Ins. Code § 1701.062. Section 1701.002 lists the following documents:

> (1) a policy, contract, or certificate of:
>     (A) accident or health insurance, including group accident or health insurance;
>     (B) medical or surgical insurance, including group medical or surgical insurance;
>     (C) life or term insurance, including group life or term insurance;
>     (D) endowment insurance;
>     (E) industrial life insurance; or
>     (F) fraternal benefit insurance;
> (2) an annuity or pure endowment contract, including a group annuity contract;
> (3) an application attached or required to be attached to the policy, contract, or certificate; or
> (4) a rider or endorsement to be attached to, printed on, or used in connection with the policy, contract, or certificate.

Tex. Ins. Code § 1701.002. Plaintiff argues that this language was clearly drafted "to prevent insurers from exercising discretionary authority pursuant to any document issued within the State, no matter the form." (DE 15 at 9.) This Court disagrees.

Plaintiff's position is not supported by the text of law upon which he relies; if the intent of the Texas Legislature was to ban the *exercise* of discretion by insurers pursuant to *any* document, they could have said as much. The plain language of the statute limits "use" of the identified documents, by any insurer, if they contain a discretionary clause. Section 1701.001 defines "use" to include only issuance and delivery. Tex. Ins. Code § 1701.001. There is no dispute that the Plan documents contain a discretionary clause, thus, they would be invalid under the plain language of the Texas Insurance Code if they (1) fall within one of the categories of documents listed in section 1701.002, and (2) they were issued or delivered by an insurer.

3

The Plan documents were neither issued, nor delivered by an insurer. The documents were issued and delivered by Plaintiff's employer LPC Services, Inc., not the Defendant. Thus, whether or not the Plan documents fall within the scope of 1701.002, they fall outside the scope of the section 1701.062 discretionary clause prohibition. The Plaintiff contends that such a conclusion draws "an artificial distinction between ERISA plan documents and insurance policies" that would render ERISA's savings clause meaningless. (DE 15 at 10.) However, this Court's decision does not rely on a distinction between the types of documents, or an interpretation of ERISA's savings and preemption clauses. Rather, it is the language enacted by the Texas Legislature that creates the distinction now applied, whether artificial or otherwise.

Plaintiff argues that the Texas Restriction might nonetheless "*indirectly* prohibit [Defendant] from exercising discretion over [Plaintiff's] claim." Plaintiff cites to the Supreme Court's rejection of the argument that ERISA preempts any state law contrary to a written plan term in *UNUM Life Ins. Co. of America v. Ward* in support. 526 U.S. 358 (1999). The *Ward* Court stated that such a broad interpretation of ERISA's preemption clause would leave States "powerless to alter the terms of the insurance relationship in ERISA plans; insurers could displace any state regulation simply by inserting a contrary term in plan documents." *Id.* at 376. However, this Court's holding does not conflict with the *Ward* decision because the issue of preemption is largely irrelevant to the case at hand.

As noted above, ERISA's savings clause indisputably applies to save the Texas Restriction from preemption. Likewise, this Court does not question the *availability* of indirect prohibition as an option for the Texas Legislature if it indeed seeks to categorically bar the exercise of discretion by insurance companies administering ERISA plans. If the Texas Restriction either directly or indirectly impacted Plaintiff's employer in its role as a benefit plan provider then the preemption issue would take on greater significance.

4

However, the statute as currently enacted creates only a limited prohibition for documents issued or delivered by an insurer. Other states have enacted insurance laws that do indirectly prohibit certain activities by non-insurer plans by virtue of broader restrictions on contracts that insurers may enter into. Comparing the limited Texas Restriction with these sweeping prohibitions provides further support for this Court's holding and clarifies why any additional discussion of preemption would be superfluous.

For instance, Massachusetts' mandatory mental health benefit law created minimum mental health coverage requirements for: "Any blanket or general policy of insurance . . . or any policy of accident and sickness insurance . . . or any employees' health and welfare fund which provides hospital expense and surgical expense benefits and which is promulgated or renewed to any person or group of persons in this commonwealth[.]" *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 730 n.11 (1985) (quoting Massachusetts Gen.Laws Ann., ch. 175, § 47B). This law created requirements for any insurance contract that was promulgated to any state citizen, not merely contracts issued or delivered by the insurers themselves. In so doing, the Massachusetts law made it necessary for the Court to address the validity of indirect regulation of benefit plans under ERISA's preemption scheme. Massachusetts restricted the terms of *all* insurance contracts and third party insured benefit plans were thus indirectly regulated because their own agreements with their employees could only incorporate policies that contained the mandatory mental health coverage. By contrast, the Texas Restriction, by its terms, seeks to regulate only those documents that insurers themselves issue or deliver. It is not a categorical bar to the exercise of discretion under any policy promulgated to Texas citizens.

If the Texas Legislature sought to indirectly limit the terms a benefit plan might include in its plan documents, they could have limited insurers' ability to enter into any contract that would permit them to exercise discretion in administering a policy they

5

underwrote. They did not do so. Plaintiff has offered no evidence that the Texas Legislature intended to create restrictions other than those they enacted into law. Because the discretion granted to Defendant by the Plan documents does not run afoul of the Texas Restriction, Defendant is entitled to this Court's deference upon review of Plaintiff's claim denial.

Accordingly, **IT IS ORDERED** that Defendant's Motion for application of the arbitrary and capricious standard of review (DE 14) is **GRANTED.**

Dated June 1, 2016.



*Karen K. Caldwell*

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JILL ROSE,                                                                          Plaintiff,

v.                                                          Civil Action No. 3:15-cv-28-DJH-CHL

LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON,                                                                          Defendant.

\* \* \* \* \*

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Jill Rose brought this action under the Employee Retirement Income Security Act (ERISA) alleging that Defendant Liberty Life Assurance Company of Boston wrongly denied her claim for disability insurance benefits. (Docket No. 1) The issue now before the Court is which standard of review the Court should apply in its examination of Liberty Life's decision to deny Rose benefits. Liberty Life has moved the Court to apply the highly deferential arbitrary and capricious standard. (D.N. 20) Rose argues for de novo review, under which no deference would be given to Liberty Life's decision. The issue turns on whether the applicable plan documents grant Liberty Life discretionary authority. Although the policy documents are silent on this point, the Plan Document and Summary Plan Description (SPD) contain clear grants of discretion. The Court thus concludes that the arbitrary and capricious standard of review applies.

**I.**

A participant in or beneficiary of an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the

1

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan grants discretion to an administrator, the Court reviews the administrator's decision under the arbitrary and capricious standard. *Wells v. U.S. Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1247 (6th Cir. 1991). The Sixth Circuit requires "that the plan's grant of discretionary authority to the administrator be 'express.'" *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1990)).

## II.

Liberty Life acknowledges that the policy itself contains no grant of discretion. The reason for this silence, it notes, is that applicable Michigan law prohibits discretionary clauses in such policies. (D.N. 20-1, PageID # 353) However, according to Liberty Life, the law does not prohibit inclusion of discretionary clauses "in any other ERISA-regulated document, such as the Plan Document or SPD." (*Id.*) Liberty Life further contends that where the policy is silent regarding discretion, the Court may examine "other relevant documents, such as the Plan Document and the SPD, 'to determine the appropriate standard of review.'" (*Id.* at 354 (quoting *Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 433 (D.C. Cir. 2011))) Therefore, Liberty Life argues, its decisions should be reviewed under the arbitrary and capricious standard because there is clear discretionary language in the Plan Document and the SPD. (*Id.*)

Rose, on the other hand, contends that the standard of review should be de novo. She points out that the policy was issued in Michigan to a Michigan resident, and the express terms clearly specify that Michigan law shall govern. (*See* D.N. 22, PageID # 377) Since Michigan

2

insurance regulations "specifically prohibit the use of discretionary clauses (language that would alter the standard of review) in ERISA plans," Rose asserts, any such clause in the policy, "and by extension the plan terms," is prohibited. (*Id*.) Additionally, Rose argues that because a Summary Plan Description cannot alter plan terms, any discretionary language in that document has no binding effect on the overall policy. (*Id*. at 380)

### III.

To determine the applicable standard of review, the Court must first decide whether the Plan Document and Summary Plan Description are relevant documents for purposes of determining whether a discretionary clause exists. If the discretionary language in these documents may be considered, the Court must then determine whether the Michigan ban on discretionary clauses renders those provisions void.

With respect to whether the Court may consider the SPD and Plan Document, Rose relies on *Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011), in which the Supreme Court concluded that "the summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan." *Id*. at 1878. *Amara* is not dispositive here. First, "even after *Amara*, a plan sponsor can still give a SPD controlling effect by incorporating it into its plan by reference." *Caesars Entm't Operating Co. v. Johnson*, No. 3:13-CV-620-CRS, 2015 U.S. Dist. LEXIS 30221, at *19 (W.D. Ky. Mar. 12, 2015) (citing *Engleson v. Unum Life Ins. Co. of Am.*, 723 F.3d 611, 620 (6th Cir. 2013)). Further, "ERISA's statutory text suggest[s] that multiple plan documents can be legally relevant," and "the ERISA sections on fiduciary responsibilities imply that there will be multiple legally important plan documents." *Rice v. Sun Life & Health Ins. Co.*, No. 1:12-CV-1362, 2014 U.S. Dist. LEXIS 127, at *13 (W.D. Mich. Jan. 2, 2014) (quoting *Pettaway*, 644 F.3d at 433).

3

The Sixth Circuit has recognized that determining whether discretionary authority exists "requires an examination of the plan documents." *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734, 743 (6th Cir. 2005) (finding application of arbitrary and capricious standard appropriate based on "[t]he language of the SPD").

In this case, the SPD is expressly incorporated into the Plan Document.  (*See* D.N. 20-1, PageID # 361-62 (quoting Plan Doc. at 5-6))  And both the Plan Document and the SPD expressly grant discretionary authority.  The Plan Document states that the Claims Administrator has "the sole and absolute discretion to decide claims and appeals" and "'shall have such discretionary power as may be necessary in order to carry out' its assigned duties and powers." (*Id.*, PageID # 360 (quoting Plan Doc. § 6.5(a)))  The SPD likewise grants discretion, stating that Claims Administrators have "'the sole and absolute discretion to interpret the Plan Document,' . . . and that such interpretations 'are conclusive and binding on all persons claiming benefits under, or otherwise having an interest in, the Program.'"  (*Id.* (quoting SPD at 30))  This language satisfies the Sixth Circuit's requirement that a grant of discretion "be 'express.'" *Yeager*, 88 F.3d at 380 (quoting *Perry*, 900 F.2d at 965)).

The Court must next decide whether Michigan's administrative rule prohibiting discretionary clauses applies to these provisions.  The rule in question is Michigan Administrative Code Rule 500.2202, titled "Insurance Policy Forms – Discretionary Clauses," which went into effect on July 1, 2007.  In *American Council of Life Insurers v. Ross*, the Sixth Circuit held "that the Michigan rules fall within the ambit of ERISA's savings clause and are not preempted by that statute."  558 F.3d 600, 609 (6th Cir. 2009); *see also Markey-Shanks v. Metro. Life Ins. Co.*, No. 1:12-CV-342, 2013 U.S. Dist. LEXIS 102412, at *17 (W.D. Mich. July 23, 2013).  However, the Sixth Circuit did not decide whether the ban on discretionary clauses

4

extends to plan documents or SPDs, which are "federally mandated ERISA plan documents regulated by the Department of Labor." *Hess v. Metro. Life. Ins. Co.*, 91 F. Supp. 3d 895, 900 (E.D. Mich. 2015).

Michigan Administrative Code Rule 500.2202 provides, in pertinent part, that "an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause." Mich. Admin. Code R. 500.2202(2)(b).  It further states that "a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect." *Id*. at 2(c).  Insurers operating in Michigan must submit to the commissioner of Michigan's Office of Financial and Insurance Services (OFIS) "a list of all forms in effect in Michigan that contain discretionary clauses," as well as "a certification that the list is complete and accurate." *Id*. at 2(e).

The word "form" is defined by M.C.L. § 500.2236(1).  Mich. Admin. Code R. 500.2201(2)(d).  The forms listed in that statute are "basic insurance policy" forms, "annuity contract" forms, "insurance or annuity application" forms, "printed rider or indorsement" forms, "form[s] of renewal certificate," and "group certification[s]."  M.C.L. § 500.2236(1).  Section 500.2236 provides that such forms "shall not be issued or delivered to a person in this state, until a copy of the form is filed with the department of insurance and financial services and approved by the director of the department of insurance and financial services as conforming with the requirements of this act and not inconsistent with the law."  *Id*.  The Eastern and Western Districts of Michigan have observed that "[a]n ERISA Plan or SPD is not among the documents subject to approval by the Commissioner." *Hess*, 91 F. Supp. 3d at 901 (quoting *Markey-Shanks*, 2013 U.S. Dist. LEXIS 102412, at *19-20).

5

The courts in *Hess* and *Markey-Shanks* focused on this omission.  In *Markey-Shanks*, the court noted that the discretionary clause in question was found "not in the Policy, but in the ERISA plan document itself, which is not subject to regulation by the Commissioner."  2013 U.S. Dist. LEXIS 102412, at *19.  Based on the plain language of the Michigan administrative rules, the court found that the rules "do not apply to ERISA SPDs and other plan documents subject to federal regulation."  *Id*. at 20 (citing 29 C.F.R. § 2520.102-3).  Accordingly, the court held that the arbitrary and capricious standard applied.  *Id*.  Expanding on that holding, the court in *Hess* applied the arbitrary and capricious standard "based on the reservation of discretionary authority . . . to defendant in the SPD."  91 F. Supp. 3d at 901-02.

The Court agrees with the reasoning in *Hess* and *Markey-Shanks* and therefore concludes that Michigan Administrative Code Rule 500.2202 does not bar grants of discretion in an SPD or plan document.  Because the SPD and Plan Document in this case expressly grant discretionary authority to Liberty Life with respect to denial of benefits, the denial of Rose's claim should be reviewed under the arbitrary and capricious standard.

Rose's contention that the de novo standard should apply because Liberty Life has not presented proof that it actually exercised discretion barely warrants discussion.  Liberty Life's denial of Rose's claim for benefits is the basis of this lawsuit.  (*See* D.N. 1, PageID # 2-3) Moreover, Liberty Life cited evidence of that denial in its motion.  (*See* D.N. 20-1, PageID # 358 (citing correspondence in administrative record regarding Liberty Life's initial denial of claim and subsequent decision on appeal))  Likewise, Rose's argument that Liberty Life has offered no evidence that the discretionary clauses in the Plan Document and SPD apply to Liberty Life is clearly meritless; each document grants discretion to the Claims Administrator, and the SPD identifies Liberty Life as the Claims Administrator.  (*See* D.N. 18, PageID # 89 (Plan Document

defining "Claims Administrator" as "the Initial Claims Reviewer or the Appeals Administrator, depending on the context in which the term is used"); *id.* (defining "Appeals Administrator" by reference to SPD); *id.*, PageID # 92 (defining "Initial Claims Reviewer" by reference to SPD); *id.*, PageID # 155 (SPD identifying Liberty Life as "Claims Administrator for Claims for Plan Benefits"))

Nor is the Court persuaded by Rose's judicial-estoppel argument.  Although Liberty Life has conceded in previous cases that the Michigan administrative rules applied, Rose has not shown that Liberty Life is estopped from arguing otherwise here.  In each of the cited cases, Liberty Life conceded that the Michigan rules apply to insurance *policies*.  (*See* D.N. 22-1, PageID # 402 (statement in brief of Liberty Life from *James v. Liberty Life Assurance Co.* that Michigan rules applied to "the DTE Energy LTD Policy"); D.N. 22-2, PageID # 425 (statement in brief of Liberty Life from *Foorman v. Liberty Life Assurance Co.* that "the OFIS Rules are applicable only to insurance policies issued or delivered in the state of Michigan"))  Here, Liberty Life does not dispute that the rules apply to the *policy*; the issue is whether Rule 500.2202 bars the grants of discretion in the SPD and Plan Document.  (*See* D.N. 20-1, PageID # 364)  As explained above, the Court finds that it does not.

### IV.

Liberty Life had discretionary authority under the plan, and it exercised that authority in denying Rose's claim for benefits.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that the Motion for Application of the Arbitrary and Capricious Standard of Review (D.N. 20) is **GRANTED**.

March 22, 2016

**David J. Hale, Judge**
**United States District Court**

7

Checkpoint Contents

 Pension & Benefits Library

  West Employee Benefits Cases

   2013

    District Court/Bankruptcy Court

     July

      07/23/2013

       **07/23/2013, United States District Court, W.D. Michigan, Southern Division., Michelle MARKEY-SHANKS, Plaintiff, v. METROPOLITAN LIFE INSURANCE COMPANY and the TRW Automotive Welfare Benefit Plan, Defendants., 2013 WL 3818838**

**West Employee Benefits Cases**

# Michelle MARKEY-SHANKS, Plaintiff, v. METROPOLITAN LIFE INSURANCE COMPANY and the TRW Automotive Welfare Benefit Plan, Defendants., 07/23/2013

MARKEY v. SHANKS

 **Docket:** No. 1:12-CV-342

**Cite:** 2013 WL 3818838

**Court:** United States District Court, W.D. Michigan, Southern Division.

 **Date:** 07/23/2013

## Counsel

Troy W. Haney, Haney Law Office PC, Grand Rapids, MI, for Plaintiff.

David M. Davis, Hardy Lewis & Page PC, Birmingham, MI, for Defendants.

## *OPINION*

**Judge:** GORDON J. QUIST, District Judge.

**[\*pg. 1]** Plaintiff, Michelle Markey- Shanks, has sued Defendants, Metropolitan Life Insurance Company ( Met Life) and the TRW Automotive Welfare Benefit Plan (Plan), **1** under the Employee Retirement Income Security Act of 1974 (" ERISA"), 29 U.S.C. §§ 1001 *et seq.,* seeking review of Met

Life's June 29, 2011 final decision denying her long-term disability benefits beyond December 13, 2010. Pursuant to the ERISA Case Management Order entered on June 6, 2012 (dkt.# 8), Defendants have filed the Administrative Record and the parties have filed cross motions for judgment on the Administrative Record in accordance with the procedures set forth in *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609 (6th Cir.1998). For the reasons set forth below, the Court will grant Defendants' motion, deny Markey- Shanks's motion, and affirm Met Life's determination that Markey- Shanks is not entitled to long-term disability benefits.

## I. BACKGROUND

Markey- Shanks was employed by TRW as a Senior Desk Top Analyst from July 3, 2000 through January 23, 2009, when she ceased working due to asthma. Markey- Shanks's Desk Top Analyst position was classified as a medium physical-exertion-level job, requiring her to, among other things, analyze computer systems and user needs, act as a troubleshooter, install computer hardware and other components, and verify correct operation of software packages. (Page ID 647.) 2

As a TRW employee, Markey- Shanks was a participant in the Plan, which provided short-term disability benefits (STD) for six months, (Page ID 35-46), and long-term disability benefits (LTD) thereafter. TRW self-funded STD benefits and provided LTD benefits through a group disability insurance policy (Policy) issued by Met life. (Page ID 180-226.) Met Life administered claims for both STD and LTD benefits. The Policy contains the following two-tiered definition of disability for purposes of LTD benefits:

**Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:

You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

You are unable to earn:

during the Elimination Period and the next 6 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and

after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

....

(Page ID 200.)

Met Life initially approved Markey- Shanks's application for STD benefits commencing January 24, 2009, but subsequently discontinued STD benefits beyond May 8, 2009, due to a lack of medical proof

supporting that Markey- Shanks was disabled. (Page ID 141.) Markey- Shanks appealed Met Life's decision, and Met Life referred the claim to an independent medical consultant, Dr. John W. Rodgers, board certified in internal medicine and pulmonary medicine, to review the file. On September 14, 2009, after reviewing various progress notes and Attending Physician Statements from Markey- Shanks's treating physician, Dr. Sridhar P. Reddy, a board-certified pulmonologist, Dr. Rodgers concluded that the medical evidence did not establish a disability. Dr. Rodgers stated that although Dr. Reddy's records showed that Markey- Shanks "has shortness of breath and has been treated appropriately with long acting and short acting bronchodilators," 3 the records lacked any information documenting "airway obstruction severe enough to preclude sedentary levels of exertion in a clean air temperature controlled office setting." (Page ID 609.) In spite of Dr. Rodgers's conclusion, Met Life reinstated Markey- Shanks's STD benefits because her job required her to work on computers at employees' desks, exposed her to dust, and required her to lift up to 50 pounds. (Page ID 71-72.) On September 30, 2009, Met Life notified Markey- Shanks that her STD benefits were reinstated through July 24, 2009-the maximum duration for STD benefits under the Plan. (Page ID 110.) Met Life further advised Markey- Shanks that she should apply for Social Security Disability Income benefits. (*Id.*)

[*pg. 2] On October 27, 2009, Met Life approved Markey- Shanks's application for LTD benefits effective July 25, 2009. (Page ID 628.) In its letter approving benefits, Met Life explained that it approved Markey- Shanks's claim because she was currently unable to perform the duties of her own occupation, but it noted that in order to be entitled to benefits beyond January 24, 2010, Markey- Shanks would have to be disabled from performing any occupation. (Page ID 629.) In addition, Met Life advised Markey- Shanks that she would continue to receive benefits only if she remained totally disabled, and therefore would have to periodically provide medical evidence of her disability. (*Id.*) An internal claim note entered by a Met Life reviewer around the same time confirmed that the medical evidence supported the severity of a functional impairment precluding Markey- Shanks from returning to her own job, but indicated that it would be reasonable to evaluate Markey- Shanks for return to work once her condition stabilized. (Page ID 261.)

In November 2009, Met Life referred Markey- Shanks's claim to a vocational rehabilitation consultant, Robert C. Reall, MA, CRC, to identify sedentary jobs that Markey- Shanks was capable of performing given her education, training, and experience. After reviewing the file, Mr. Reall prepared an Employability Assessment and Labor Market Analysis identifying three sedentary jobs that Markey- Shanks was capable of performing, including Systems Analyst, User Support Analyst, and Computer Systems Hardware Analyst, all of which were available in the geographic areas in which she resided. 4 (Page ID 398-99.)

On December 14, 2009, Dr. Reddy sent a letter and updated office notes to Met Life regarding Markey- Shanks's condition. Dr. Reddy stated that Markey- Shanks had been diagnosed with severe asthma that required frequent treatments with systemic steroids to stabilize her condition. (Page ID 612.) Dr. Reddy further stated:

Per my records, you do have documentation of her clinical condition as far as my progress notes go up

until July 8, 2009. She subsequently was seen in our office on August 19, 2009. She had just received prednisone from her family care physician and continued to require a high amount of medication to keep her asthmatic symptoms under control. On September 30, 2009, she subsequently went to try for medical relocation to Arizona. She had to be restarted on prednisone and was seen again on November 23, 2009. At that time, spirometric evaluation was done which essentially showed a significant decrease in her peak flows. She was restarted on prednisone and tapered off over a one-week period. She was re-seen on November 30, 2009, and had some resolution of her symptoms, though not completely.

My impression on Michelle Markey- Shanks continues to remain severe asthma for which she is considered beyond a reasonable degree of doubt and with considerable medical certainty to be completely disabled from any work at this time. She has frequent exacerbations and is requiring a high amount of medication including systemic steroids, leukotriene inhibitors, beta-2 agonists and high-dose aerosolized steroids to keep her symptomatology under control. She has significant asthmatic triggers, including cold air, humidity, perfumes, deodorants, after shave, powders, scented candles, smell of cigarettes, different hair sprays, dust, mold, grass and trees, and talking causes her to go into coughing fits, to name a few.

[*pg. 3] From a medical perspective and my perspective, I would consider her completely disabled from any kind of work at this time. She will continue over her lifetime to continue to check her peak flows and use asthmatic medications. Because of the natural history of her disease and the severity of her disease, it is not unexpected that she will require courses of high-dose steroids along with her other medications in the future.

(Page ID 612-13.) On December 21, 2009, after reviewing Dr. Reddy's letter and other information that Dr. Reddy provided, Dr. Rodgers amended his September 14, 2009 opinion to conclude that Markey- Shanks's frequent asthmatic attacks would have disabled Markey- Shanks from performing sedentary work though December 21, 2009. (Page ID 597-98.)

In July 2010, Met Life requested from Dr. Reddy updated medical information concerning Markey- Shanks's functionality, restrictions, limitations, treatment plan, and return-to-work progress. On August 23, 2010, Met Life received from Dr. Reddy an Attending Physician Statement and his office notes from a July 12, 2010 examination of Markey- Shanks. Dr. Reddy's office notes stated that Markey- Shanks had one episode of shortness of breath, for which she had to use prednisone, but "otherwise has been doing well overall and spent time in Michigan and Arizona." (Page ID 526.) Met Life referred Markey- Shanks's claim file to Medical Consultants Network to review the file and opine on any functional limitations. Dr. Leonard Sonne, a board-certified physician in pulmonary medicine, reviewed the file and issued a report on October 13, 2010, concluding that the medical information did not support any functional limitations beyond July 2010 that would preclude full-time employment. (Page ID 556.) In support of his conclusion, Dr. Sonne noted that in various office visits, including her most recent one, Dr. Reddy had found Markey- Shanks's chest completely clear or there was some wheezing only on forced expiration. Dr. Sonne stated that the file lacked any information showing that Markey- Shanks

had been admitted to a hospital for severe asthmatic incidents or had been admitted to an emergency room for asthma and that the results of a pulmonary functions studies done during one office visit did not preclude full-time work in her position. Dr. Sonne noted the absence of any documentation of tachycardia-a condition in which the heart beats faster than normal that patients with severe asthma often experience. Finally, Dr. Sonne noted that Markey- Shanks was able to travel back and forth periodically between Michigan and Arizona without any difficulty. (Page ID 557.) Met Life sent Dr. Sonne's report to Dr. Reddy for his comments. Dr. Reddy responded on October 28, 2010, stating that he disagreed with Dr. Sonne's findings because Markey- Shanks continued to have shortness of breath and continued to use systemic steroids, high-dose inhaled steroids, and leukotriene inhibitors, which rendered her unable to work. (Page ID 496.) Dr. Sonne reviewed Dr. Reddy's response and stated that it did not affect his prior conclusion because it did not "provide any objective documentation of any restriction, limitation, or impairment that would preclude full time work." (Page ID 489-90.)

[*pg. 4] On December 13, 2010, Met Life notified Markey- Shanks of its decision to terminate her benefits because she no longer met the requirements for disability under the Plan. (Page ID 527.) In its letter, Met Life noted that Markey- Shanks had been out of work due to her asthma. Met Life further noted that Dr. Reddy's most recent office notes indicated that Markey- Shanks had only one episode of shortness of breath and had to use a prednisone taper, but otherwise was doing well overall, and that on physical examination her vital signs were stable, her chest was clear, and her cardiovascular system revealed a normal heartbeat. (Page ID 528.) Met Life also advised Markey- Shanks that it had sent her claim to an Independent Physician Consultant (IPC) for review and the IPC's (Dr. Sonne's) October 13, 2010 report concluded that the medical information in the claim file did not support any functional limitations beyond July 2010 precluding Markey- Shanks from working full-time at any position. Met Life further explained that the IPC's conclusions relied on unremarkable findings from physical exams, the lack of evidence of tachycardia, the lack of hospitalizations or emergency room admissions for asthma, and the absence of records substantiating pulmonary restriction. (*Id.*) Finally, Met Life identified three jobs in the local economy that Markey- Shanks could perform and concluded:

In summary, although you and your health care provider indicate you are unable to work at any occupation due to your asthma, the medical and vocational information available for review, [sic] no longer supports you meet [sic] the requirements of your employer's plan. The medical information provided for review does not substantiate your inability to perform any occupation and earn a gainful wage as supported by the employability and labor market analysis outlined above. For these reasons, your claim is terminated effective the date of this notification.

(Page ID 531.) Met Life also advised Markey- Shanks of her right to appeal the determination.

Markey- Shanks appealed the initial determination on April 27, 2011. In her written appeal, Markey- Shanks advised that, apart from her asthma, she suffers from several other conditions, including tachycardia; bradycardia (a slower-than-normal heart rate); Rosaca, a chronic, inflammatory skin condition; and sleep apnea. (Page ID 523-24.) Met Life referred the claim for review to Dr. John W. Rodgers, who had previously reviewed Markey- Shanks's claim, and to Dr. Richard B. Evans, board

certified in internal medicine, pulmonary medicine, critical care medicine, and occupational medicine. In his report issued May 27, 2011, Dr. Rodgers observed that although Dr. Reddy's notes indicated that Markey- Shanks had episodes of coughs and wheezing, there was no documentation of formal pulmonary function tests. (Page ID 424.) Dr. Rodgers also indicated that (1) there was no evidence that Markey- Shanks's tachycardia could not be controlled with medications or that her symptoms limited sedentary activities; (2) there was no documentation that her sleep apnea caused an impairment; (3) there was no evidence that her medications caused side effects that resulted in functional restrictions; (4) Markey- Shanks was using asthma medications only for episodes of asthma rather than chronically; and (5) there was no indication that she could not "manage activities of daily living, walk, sit[,] stand for 8 hours intermittently, bend, stoop, twist, reach above and below shoulder height, use a keyboard, lift up to 20 lbs. intermittently." (*Id.*) Dr. Rodgers concluded that, with the exception of needing to work in a clean air, humidity- and temperature-controlled environment, Markey- Shanks had no functional limitations precluding her from performing sedentary work.

[*pg. 5] In his report, issued June 6, 2011, Dr. Evans indicated that although Dr. Reddy had characterized Markey- Shanks's asthma as "severe," the file lacked objective data or pulmonary function tests supporting this conclusion. Like Dr. Sonne, Dr. Evans noted the absence of documents showing that Markey- Shanks had been hospitalized for asthma. Dr. Evans did indicate that Dr. Reddy had "one pulmonary function test which showed a post bronchodilator FEV 1 of 2.05 liters, 76% of predicted, and a 33% improvement in FEV 1 following bronchodilators," but Markey- Shanks's asthma would only be characterized as "moderate" under the American Thoracic Society Guidelines for the Evaluation of Impairment/Disability in Asthma. (Page ID 409.) Dr. Evans concluded that Markey- Shanks had asthma of moderate severity, which would preclude her "from working in extremely heavy work; extremes of temperature or humidity and from work with exposure to fumes, such as working in a chemical factory," but her asthma did not preclude her from office-based work. (*Id.*) Met Life sent Dr. Rodgers' and Dr. Evans' reports to Dr. Reddy for his comment, but Dr. Reddy did not respond. (Page ID 389.)

On June 29, 2011, Met Life informed Markey- Shanks of its decision to uphold the original determination that she was no longer disabled. Met Life explained that her claim had been reviewed by an IPC (Dr. Evans), who indicated that Markey- Shanks's had asthma of moderate severity but was able to perform sedentary work in a clean environment. (*Id.*) As for the other impairments Markey- Shanks identified in her appeal letter, Met Life noted that the IPC had indicated that there was no evidence that such conditions could not be effectively controlled through medication or that they would prevent her from performing sedentary work. Finally, Met Life advised Markey- Shanks that she had exhausted her administrative remedies under the Plan for her claim based on her asthma and tachycardia. (Page ID 391.) Thereafter, Markey- Shanks filed the instant case seeking review of Met Life's termination of benefits.

## II. DISCUSSION

**A. Standard of Review**

The default standard of review in a claim seeking review of denial of benefits under ERISA § 502(a)(1)(B) , 29 U.S.C. § 1132(a) (1)(B) , is de novo. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). On the other hand, a court employs a deferential standard of review if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956-57; *see also Cox v. Standard Ins. Co.,* 585 F.3d 295, 299 (6th Cir.2009) ("When the plan gives the administrator discretionary authority, we apply the highly deferential arbitrary and capricious standard.").

The Plan contains the following provision regarding Met Life's discretionary authority:

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

[*pg. 6] (Page ID 233.) This language provides a sufficiently clear and express grant of discretionary authority to Met Life to warrant application of the deferential standard of review.

Markey- Shanks concedes that the discretionary clause warrants application of the deferential standard of review, (Pl.'s Br. Supp. Mot. at 11), but she contends that Met Life should be precluded from arguing for application of that standard. Her argument revolves around the adoption of Rules 500.2201 and 500.2202 of the Michigan Administrative Code. Rule 500.2202 prohibits the inclusion of a "discretionary clause" in "a policy, contract, rider, indorsement, certificate, or similar contract" as of June 1, 2007. Mich. Admin. Code Rule 500.2202(b). The prohibition applies to insurance policies and related documents issued before June 1, 2007 only if the document was revised after June 1, 2007. *Id.* The Sixth Circuit has held that Rule 500.2202(b) falls within ERISA's savings clause and is thus not preempted by ERISA's express preemption clause, ERISA § 514(b)(2)(A) , 29 U.S.C. § 1144(a) . *Am. Council of Life Insurers v. Ross,* 558 F.3d 600, 604-07 (6th Cir.2009). Markey- Shanks admits that Rule 500.2202 does not apply to the Policy because Met Life issued it before June 1, 2007, and did not amend it after that date. (*Id.* at 11-12.) Nonetheless, she contends that Met Life is precluded from enforcing the discretionary clause because Met Life certified to the Commissioner of Michigan's Office of Financial and Insurance Services (OFIS) that Met Life had removed discretionary authority language from certain group long-term care and long-term disability policies and, after March 1, 2007, would not advertise or sell any policy in Michigan containing "discretionary authority language disapproved in the December 21, 2006, Notice of Disapproval." (*Id.* Ex. 2, Page ID 822.) Markey- Shanks notes that Met Life made this representation in response to the Commissioner's notice that she would seek to decertify policy forms issued prior to June 1, 2007 that contained discretionary clauses.

Markey- Shanks does not identify a legal basis for precluding Met Life from enforcing the discretionary clause, although she appears to rely on some form of estoppel. Whatever its basis, her argument fails because apart from its certification, Met Life advised the Commissioner that "for plans governed by [ ERISA] in which Met Life provides insurance to fund the plans, Met Life will continue to be guided by the terms of the summary plan description ("SPD") that employers as plan administrators are required to create and distribute to their plan participants." (*Id.* Ex. 2, Page ID 823.) Met Life further advised the Commissioner that SPDs are regulated by the United States Department of Labor rather than state insurance regulators. (*Id.*) Met Life thus did not mislead the Commissioner or misrepresent its intention to continue applying discretionary clauses when they are contained in documents regulated by ERISA rather than state insurance laws. In the instant case, the discretionary clause is contained not in the Policy, but in the ERISA plan document itself, which is not subject to regulation by the Commissioner. In this regard, the administrative rules that Markey- Shanks cites apply only to insurance policies and other documents subject to approval by the Commissioner. A " '[d]iscretionary clause' is a provision in a form that purports to bind the claimant or to grant deference in subsequent proceedings to the insurer's decision ...." Mich. Admin. Code Rule 500.2201(c). A "form" is "a form identified in MCL 500.2236(1)." Mich. Admin. Code Rule 500.2201(d). Section 500.223 6(1), in turn, provides that an insurer may not issue an insurance policy, application form, rider, indorsement, renewal certificate, or group certificate in Michigan until the Commissioner approves the form. An ERISA Plan or SPD is not among the documents subject to approval by the Commissioner. *See Am. Council of Life Insurers,* 558 F.3d at 605 (noting that "under the plain language of the rules, any insurer who wishes to provide insurance in Michigan must submit its insurance forms to the Commissioner for review and may not include a discretionary clause in such forms"). The plain language of Rules 500.2201 and 500.2202 thus makes clear that they do not apply to ERISA SPDs and other plan documents subject to federal regulation. *See* **29 C.F.R. § 2520.102-3** (specifying information that must be included in an SPD). Moreover, the documents Markey- Shanks submits show that in its communications with Met Life and other insurers, OFIS was concerned only with discretionary clauses contained in insurance policies and other insurance-related documents subject to the Commissioner's approval. **5** Accordingly, the Court must apply the arbitrary and capricious standard in reviewing Met Life's decision.

**[*pg. 7]** The arbitrary and capricious standard " 'is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.' " *Davis v. Kentucky Fin. Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir.1989) (citation omitted) (quoting *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir.1985)); *see also Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir.1991) (noting that administrators' decisions "are not arbitrary and capricious if they are 'rational in light of the plan's provisions' ") (quoting *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th Cir.1988)). Although the standard is highly deferential, it still requires "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir.2003). Thus, a court must do more than merely rubber stamp the administrator's decision. *Id.* The decision must be upheld, however, "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance*

*Standard Life Ins. Co.,* 601 F.3d 497, 501 (6th Cir.2010) (internal quotation marks omitted).

## B. Conflict of Interest

In applying the arbitrary and capricious standard, a court must consider and evaluate potential conflicts of interest that may affect the plan administrator's decision. *See Glenn v. MetLife,* 461 F.3d 660, 666 (6th Cir.2006), *aff'd* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) . A potential conflict of interest exists where, as here, the plan administrator reviews and pays claims. *See id.* A conflict of interest does not change the standard of review, but is simply one consideration a court weighs in applying the arbitrary and capricious standard. *Smith v. Continental Cas. Co.,* 450 F.3d 253, 260 (6th Cir.2006). A conflict of interest carries more than only some weight, however, when there is "significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Id.* For example, a court may accord a conflict of interest greater weight were there is evidence that "an insurance company administrator has a history of biased claims administration." *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 117, 128 S.Ct. 2343, 2351, 171 L.Ed.2d 299 (2008). In a recent decision, the Sixth Circuit observed that following the Supreme Court's decision in *Glenn,* the Sixth Circuit "has given greater weight to the conflict-of-interest factor when the claimant 'offers more than conclusory allegations of bias.' " *Judge v. Metro. Life Ins. Co.,* 710 F.3d 651, 664 (6th Cir.2013) (quoting *DeLisle v. Sun Life Assurance Co. of Canada,* 558 F.3d 440, 445 (6th Cir.2009)).

Although Markey- Shanks raises Met Life's conflict of interest as a factor the Court should consider, she fails to cite any particular evidence suggesting that bias influenced Met Life's determination in any manner. Accordingly, while the Court considers Met Life's conflict of interest, it finds no reason to accord that factor significant weight. *See id.* (concluding that the plaintiff's mere reliance on "the general observation that Met- Life had a financial incentive to deny the claim" provided no basis for giving more weight to the conflict-of-interest factor).

## C. Met Life's Decision

[*pg. 8] In reviewing a plan administrator's denial of benefits, "the ultimate issue ... [for the court] is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.,* 313 F.3d 356, 362 (6th Cir.2002). The information Met Life reviewed included the opinion of Dr. Reddy, Markey- Shanks's treating pulmonologist, who concluded that Markey- Shanks was totally disabled from even sedentary work, and the opposing opinions of three similarly-qualified IPCs, Drs. Rodgers, Sonne, and Evans, who opined that although Markey- Shanks had moderate asthma and required a clean air, humidity- and temperature-controlled environment, she was not disabled from performing sedentary office work. In its final determination, Met Life relied on Dr. Evans's opinion, noting:

The consultant noted that he spoke with Dr. Reddy, who stated that he felt that you were disabled from work, predominantly based on your extensive medication use and that he felt that you were frequently being treated by your family physician for asthma exacerbations. The consultant discussed with Dr.

Reddy that there was little in the way of objective findings of asthma impairment in the file. Dr. Reddy stated that he was predominantly treating you without pulmonary tests when his clinical impression was asthma exacerbation. The consultant stated that Dr. Reddy did have one pulmonary function test which showed a post bronchodilator FEV 1 of 2.05 liters, 76% of predicted, and a 33% improvement in FEV1 following bronchodilators.

After a complete review of all information provided, the consultant noted in regards to your asthma, there was no documentation provided of any hospitalizations, emergency room visits or urgent physician visits for your asthma. You did require treatment with daily inhaled steroids and occasional courses of oral steroids.... The consultant concluded that based on objective findings available, and from the phone conversation with Dr. Reddy, you have moderate asthma and were capable of sedentary work in a clean environment. The consultant indicated that the information did support asthma of moderate severity, and that this would preclude you from working in extremely heavy work; extremes of temperature or humidity and from work with exposure to fumes. The consultant indicated that moderate asthma did not prevent you from office based work.... The consultant noted that there was no clinical evidence to support restrictions and limitations or side effects from the medications that you were taking from December 10, 2010 forward. In summary, based on your moderate asthma, you were capable of sedentary work in a clean environment.

(Page ID 388-89.) **6**

Markey- Shanks cites no basis to question the validity or soundness of Dr. Evans's opinion, such as incorrect or insufficient information, unfounded assumptions, or conclusory analysis. However, she offers several grounds for concluding that Met Life's decision was arbitrary and capricious.

**[\*pg. 9]** First, Markey- Shanks argues that Met Life acted arbitrarily and capriciously by not exercising its contractual right to have her submit to an independent medical exam and, instead, retaining three physicians to conduct file reviews. She further contends that the Sixth Circuit disfavors a plan administrator's reliance on a medical opinion generated by a "cold" file review, as opposed to the opinion of the treating physician who actually examined the claimant. Markey- Shanks is correct that, in a number of cases, the Sixth Circuit has criticized the decisions of plan administrators to opt for file reviews in lieu of physical examinations. *See, e.g., Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 621 (6th Cir.2006); *Kalish v. Liberty Mut./ Liberty Life Assurance Co. of Boston,* 419 F.3d 501, 509 (6th Cir.2005); *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 295 (6th Cir.2008). At the same time, the court has observed that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert,* 409 F.3d at 296. Whether a plan administrator acted improperly by relying on a file review instead of exercising its right to conduct a physical examination thus depends on the particular circumstances of the case. *See id.* at 295 (noting that "the failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination"). The circumstances in this case do not render Met Life's reliance on a file review objectionable. The Sixth Circuit has frowned on file reviews only where the reviewer makes a credibility

determination or the plan administrator unreasonably credits the file reviewer's opinion over that of the treating physician. *See Judge,* 710 F.3d at 663. Neither situation is present here. Dr. Evans merely reviewed the medical records and determined that there were no clinical findings or objective data indicating more than moderately severe asthma, without opining on Markey- Shanks's credibility. Moreover, Met Life articulated its reasons for crediting Dr. Evans's opinion over that of Dr. Reddy, namely, that his opinion of severe asthma was not supported by objective evidence. *See Curry v. Eaton Corp.,* 400 F. App'x 51, 60 (6th Cir.2010) (stating that while a plan administrator may not simply choose to ignore a treating physician's opinions, "it can resolve conflicts between those opinions and the opinions of its own file reviewers if it provides reasons-including a lack of objective evidence-for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review"). Given the conflicting opinions, Met Life was thus entitled to credit Dr. Evans's opinion that Markey- Shanks's asthma did not preclude her from performing sedentary work in a clean air, temperature- and humidity-controlled office environment. *See McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir.2003).

**[\*pg. 10]** Markey- Shanks next argues that Met Life failed to adequately consider the effect of the powerful and high-dose medications that she must take on her ability to work. Markey- Shanks cites *Smith v. Continental Casualty Co.,* 450 F.3d 253 (6th Cir.2006), in which the Sixth Circuit held that the defendant's denial of benefits was arbitrary and capricious because the defendant failed to adequately consider the effect the number and nature of medications the claimant was taking had on her ability to work. *Smith* is distinguishable for two reasons. First, unlike the defendant's reviewing physician in *Smith,* Dr. Evans actually commented on the effects of the medications Markey- Shanks was taking, noting that "[t]here is no clinical evidence to support restrictions and limitations or side effects from medications taken from 12/10/10 to the present." (Page ID 410.) Second, the claimant's medications in *Smith* included Oxycontin and other narcotic pain relievers, which could be expected to impair one's ability to work. *See id.* at 264. There is no evidence that Markey- Shanks is on narcotic pain relievers and, as Dr. Evans observed, there is no indication in the record that the medications Markey- Shanks was taking would produce disabling effects similar to those of narcotic pain medication.

Markey- Shanks also contends that Met Life is estopped from taking a position contrary to that of the Social Security Administration (SSA), which found Markey- Shanks disabled under the Social Security Act, because Met Life required Markey- Shanks to file for Social Security Disability benefits and reaped a benefit from the award by recovering overpayments from Markey- Shanks pursuant to the Policy's offset provision. This argument fails because the SSA issued its award more than seven months after Met Life issued its final determination. **7** The Sixth Circuit has held that

if the plan administrator (1) encourages the applicant to apply for Social Security disability benefits; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on a question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.

*Bennett v. Kemper Nat'l Servs., Inc.,* 514 F.3d 547, 554 (6th Cir.2008) (citing *Glenn,* 461 F.3d at 669).

The court's rationale cannot be that the mere existence of a Social Security award renders a plan administrator's denial of benefits arbitrary and capricious, because *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), forecloses such a result. Rather, a plan administrator's *failure to explain* a decision contrary to a SSA decision may be indicative of an arbitrary and capricious determination. *Bennett,* 514 F.3d at 553 n. 2 (stating that "mere mention of the decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA"). In this regard, Markey- Shanks's argument runs into two insurmountable obstacles. First, because this Court's review is confined to the documents the plan administrator had before it when it made its decision, *see Wilkins,* 150 F.3d at 615, the Court cannot consider the SSA's award. Second, even if the Court could consider the award, it provides no basis to assess whether Met Life acted arbitrarily and capriciously because Met Life had nothing to explain when it issued its decision.

**[*pg. 11]** Next, Markey- Shanks argues that Met Life's denial of benefits was unreasonable because, in conducting its vocational analysis, Met Life failed to fully consider whether the sedentary jobs that Met Life identified were jobs that Markey- Shanks could perform in light of her functional limitations, specifically, the broad range of environmental triggers of her asthma attacks. Markey- Shanks further notes that a Met Life claims specialist noted that "ee [Markey- Shanks] needs a work environment totally free of dust or any other air contaminents [sic] and it is very doubtful that such an office exists." (Page ID 277.) Citing *Rabuck v. Hartford Life and Accident Insurance Co.,* 522 F.Supp.2d 844 (W.D.Mich.2007), Markey- Shanks contends that Met Life's vocational analysis was deficient. In *Rabuck,* Magistrate Judge Scoville found that the administrator's vocational determination was arbitrary and capricious because the administrator's vocational analysis failed to consider the non-strength requirements of the plaintiff's job and how the plaintiff's short-term memory deficit affected his ability to perform those job duties. *See id.* at 876-77.

*Rabuck* is distinguishable from the instant case because the evidence in this case shows that Met Life considered all of Markey- Shanks's functional limitations, by including a clean air temperature controlled office setting in her restrictions. (Page ID 398.) Given that Dr. Evans concluded that the objective evidence supported only moderately severe asthma precluding Markey- Shanks from performing extremely heavy work or working in temperature extremes or exposed to fumes, such as in a chemical refinery, the requirement of a clean air environment specifically addressed her limitations. To the extent that Markey- Shanks suggests that Met Life somehow bound by its internal notation that a totally dust- and contaminant-free office environment likely does not exist, Markey- Shanks fails to cite any authority for such a proposition. In any event, while it is probably true that such an environment does not exist (anywhere in the world), there is no indication in the record that a person with moderately-severe asthma requires such a sterile environment.

Finally, Markey- Shanks argues that Met Life's decision must be reversed because Met Life failed to show the requisite change between October 2009, when it approved Markey- Shanks's application for LTD benefits, and late 2010, when it terminated her benefits. Markey- Shanks notes that in an October 21, 2009 file note, Met Life noted that it may be reasonable to evaluate Markey- Shanks for return to work later, when her condition "stabilized." She further notes that even if her condition "stabilized," Met

Life has not shown that her condition improved in any respect that would support a finding that she was not disabled. Met Life responds that Markey- Shanks's argument fails to consider that the Plan's definition of "disability" changed effective January 24, 2010, from "own occupation" to "any occupation" and that under the new definition, Markey- Shanks had the burden of showing that she was disabled from any occupation taking into account her training, education and experience.

[\*pg. 12] The record shows that Met Life approved Markey- Shanks's application for LTD benefits in October 2009 because she was unable to perform the duties of her Senior Desktop Analyst position, which exposed her to dusty conditions. Although the Policy's definition of "disability" changed on January 24, 2010 from "own occupation" to "any occupation," it did not review her eligibility for benefits under the changed definition until the summer or fall of 2010. Met Life's conclusion in 2010 that Markey- Shanks was not disabled was thus not unreasonable, even if Markey- Shanks's condition had not improved, because Met- Life's determination that Markey- Shanks was disabled under the Policy's "own occupation" definition was not determinative of whether she was disabled under the Policy's stricter "any occupation" definition. *See Martindale v. Lincoln Nat'l Life Ins. Co.,* No. 10-15173, 2011 WL 3957607, at[\*pg. 10] (E.D.Mich. Sept.8, 2011).

## III. CONCLUSION

Having reviewed Met Life's decision in light of the administrative record, the Court concludes that Met Life made a reasoned decision based on substantial evidence, did not arbitrarily reject the opinions of Markey- Shanks's treating physician, and reasonably resolved conflicts among competing medical opinion. *See Glenn,* 461 F.3d at 666. Accordingly, Met Life's decision was not arbitrary and capricious, and the Court will grant Met Life's motion and affirm its decision.

An Order consistent with this Opinion will be entered.

W.D.Mich.,2013.

Markey- Shanks v. Metropolitan Life Ins. Co.

Slip Copy, 2013 WL 3818838 (W.D.Mich.)

1 The proper TRW Defendant appears to be the TRW Disability Income Insurance Long Term Benefits Plan, rather than the TRW Automotive Welfare Benefit Plan.

2 Citations refer to pages of the Administrative Record in the CM/ECF Page ID# system.

3 Markey- Shanks's asthma medications included Singulair, Albuterol, and Pulmicort. (Page ID 153.)

**4** Markey- Shanks resided in both Michigan and Arizona during the period of time that she received LTD benefits.

**5** The Court acknowledges that the Policy is properly considered part of the ERISA Plan documents. *See Pettaway v. Teachers Ins. & Annuity Ass'n of Am.,* 644 F.3d 427, 433 (D.C.Cir.2011) (noting that " ERISA's statutory text suggest that multiple plan documents can be legally relevant" and that "the ERISA sections on fiduciary responsibilities imply that there will be multiple legally important plan documents"). However, the Michigan Rules pertain only to insurance documents subject to approval by the Commissioner. Whether the State of Michigan may specifically prohibit insurers from including discretionary clauses in ERISA SPDs they furnish to employers in connection with the sale of group insurance policies is a question this Court need not consider.

**6** Met Life also noted that Dr. Evans addressed Markey- Shanks's other conditions, including sleep apnea and tachycardia and concluded that those conditions would not limit Markey- Shanks from performing sedentary work. (Page ID 388-89.) Markey- Shanks does not dispute these findings in this case.

**7** The Court relies on Defendants' representation in their response brief as to when the SSA issued its award, because the award is part of the Administrative Record and no other document indicates when the award was issued. Markey- Shanks does not dispute Defendants' representation, and even concedes that the SAA issued the award after Met Life made its final determination. (Pl.'s Reply Br. at 4.)

© 2016 Thomson Reuters/West

© 2016 Thomson Reuters/Tax & Accounting. All Rights Reserved.

Checkpoint Contents
  Pension & Benefits Library
    West Employee Benefits Cases
      2012
        Court of Appeals
          August
            08/15/2012
              **08/15/2012, United States Court of Appeals, Fifth Circuit., Antonio JIMENEZ, III, Plaintiff-Appellee v. SUN LIFE ASSURANCE COMPANY OF CANADA; John Meyer; Allen Carr, Defendants-Appellants., 53 EBC 2640, 486 Fed Appx 398, 2012 WL 3495259**

**West Employee Benefits Cases**

# Antonio JIMENEZ, III, Plaintiff-Appellee v. SUN LIFE ASSURANCE COMPANY OF CANADA; John Meyer; Allen Carr, Defendants-Appellants., 08/15/2012

JIMENEZ, III v. SUN LIFE ASSURANCE COMPANY OF CANADA

 **Docket:** No. 11-30872

**Cite:** 53 EBC 2640, 486 Fed Appx 398, 2012 WL 3495259

**Court:** United States Court of Appeals, Fifth Circuit.

 **Date:** 08/15/2012

# Counsel

James Edward Diaz, Sr., Esq., Joseph L. Lemoine, Jr., Esq., Lemoine & Associates, L.L.C., Lafayette, LA, for Plaintiff-Appellee.

Joshua Bachrach, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., Philadelphia, PA, Vicki Ann Elmer, Paul Joseph Politz, Esq., Taylor, Wellons, Politz & Duhe, A P.L.C., New Orleans, LA, for Defendants-Appellants.

**Appeal from the United States District Court for the Western District of Louisiana, No. 6:10-CV-01307.**

**Judge:** Before HIGGINBOTHAM, GARZA, and CLEMENT, Circuit Judges.

PER CURIAM: *

[*pg. 1] Antonio Jimenez III filed suit against Sun Life Assurance Company of Canada ("Sun Life"), the claims fiduciary for an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, and two of its employees. Jimenez alleged that Sun Life wrongfully denied his claim for long-term disability benefits under the plan, and he sought damages and other relief under ERISA and Louisiana law. After the parties filed cross-motions for summary judgment, the district court granted summary judgment for Jimenez on the issue of coverage and made its judgment final pursuant to Federal Rule of Civil Procedure 54(b). Sun Life appealed. For the following reasons, we REVERSE and RENDER on the coverage issue and REMAND to the district court for further proceedings consistent with this opinion.

# I

Antonio Jimenez was seriously injured in a one-car accident in Lafayette Parish, Louisiana. According to the police report, his car left the road for over 300 feet, hit several obstructions, and flipped upside down. Jimenez was immediately taken to the hospital for treatment of his injuries. Eventually, Jimenez claimed that he had lost control of his vehicle when he was forced to swerve off the two-lane road by two vehicles racing toward him, one in each lane. [1] In the police report, the investigating officer noted as contributing factors and conditions of the incident (1) a violation for careless operation and (2) a suspicion that alcohol was involved.

When medical staff admitted Jimenez to the hospital, they observed that he "was intoxicated and presents a poor historian." The medical staff also noted that Jimenez claimed to "often drink[ ] up to a case a day when he is off call" from his job as a coiled tubing operator on offshore oil wells. A police officer asked a nurse to take a blood sample from Jimenez to measure his blood alcohol content ("BAC"). The police sent the blood sample to a crime lab, which found that Jimenez's BAC was 0.15, nearly twice the legal limit in Louisiana. Both parties concede that Jimenez was rendered disabled by the accident and is now unable to perform his job.

At the time of the accident, Jimenez was an employee of Coiled Tubing Company in Lafayette, a division of Smith International, Inc. ("Smith International"). Smith International, which is headquartered in Texas, maintains a Long Term Disability Plan for covered employees. The Plan consists of a group long-term disability insurance policy issued to Smith International by Sun Life. Smith International also maintains a Short Term Disability Plan for its employees. Jimenez received benefits under the Short Term Plan.

When his Short Term benefits expired, Jimenez filed a claim for Long Term Disability Benefits under Smith International's insurance policy with Sun Life ("the Policy"). Notably, the Policy states that it "is delivered in Texas and is subject to the laws of that jurisdiction." Under the Policy, Smith International pays the premium to provide its employees with long term disability coverage, and Sun Life pays benefits to employees in accordance with the Policy's terms. The Policy expressly excludes from coverage losses "due to ... committing or attempting to commit an assault, felony or other illegal act."

[\*pg. 2] Sun Life initially denied Jimenez's claims for benefits by letter. Sun Life stated that its review of Jimenez's medical records revealed that his BAC indicated that he had been operating a vehicle while under the influence at the time of the accident. 2 Sun Life then invoked the "illegal acts" exclusion in the policy:

Your policy states:

Exclusions[:] *No LTD benefit will be provided for any Total or Partial Disability that is due to:*

*4. committing or attempting to commit an assault, felony or other illegal act.*

Because the documentation submitted with your claim indicated that your injuries were the result of the accident in which you were operating a vehicle under the influence, the group policy excludes any disability resulting from such accident. Therefore, your claim is denied.

The letter also notified Jimenez of his right to request that Sun Life review its initial denial and to bring a subsequent ERISA suit following an adverse determination on review.

Jimenez timely requested an administrative appeal through counsel. He first noted that he had not been charged with or convicted of a driving while intoxicated offense. He then contended that Sun Life could not deny coverage under the "illegal acts" exclusion because the Policy did not contain a specific "intoxication" exclusion. Jimenez also asserted that "driving under the influence" did not constitute an "illegal act" under the exclusion based on an application of the "rule of *ejusdem generis.* " Lastly, he asserted that even if driving under the influence were an "illegal act" under the Policy, Sun Life could not establish causation. That is, Jimenez argued that Sun Life could not prove by a preponderance of the evidence that but for his intoxication offense Jimenez's injuries would not have occurred. Instead, Jimenez argued that his accident occurred because he had swerved off the road to avoid a head-on collision with two cars racing down the street.

Sun Life initially responded by invoking its statutory right to a 45-day extension of its deadline to decide Jimenez's administrative appeal. Sun Life subsequently informed Jimenez that it needed "additional time" to decide his appeal because it needed "additional information" from the police and the district attorney's office regarding the accident. Sun Life acknowledged its statutory deadline for deciding Jimenez's administrative appeal, but it stated that its deadline was tolled until it received the requisite information to complete its review.

As part of its investigation of the appeal, Sun Life engaged a medical expert to assess Jimenez's medical records. The expert concluded that based on the crime lab's analysis of Jimenez's BAC, "[a]ssuming normal toxicokinetics, with a reasonable degree of medical certainty, it would be reasonable to conclude that at [the time of the accident], the claimant's [BAC] was above 0.08%." The expert's report also included a chart listing the progressive effects of increased BAC levels, which indicated that Jimenez's BAC at the time of the accident would have impaired his reflexes, reaction time, and gross motor control.

[*pg. 3] Eventually, Jimenez was indicted for driving while under the influence of an alcoholic beverage ("DUI") and for careless operation of a vehicle. 3 The next week, Sun Life denied Jimenez's administrative appeal, finding (1) that his medical records, his indictment for DUI, and the medical expert's report all indicated that he was committing an illegal act at the time of his accident and (2) that the expert report indicated that his level of intoxication and impairment contributed to the accident. Accordingly, Sun Life denied Jimenez's claim for long-term disability benefits under the Policy pursuant to its "illegal acts" exclusion.

Jimenez filed suit in the district court against Sun Life and two of its employees who reviewed his claim. He asserted causes of action under both Louisiana law and ERISA. Sun Life filed motions for partial summary judgment on (1) the applicability of ERISA to Jimenez's claims and (2) the merits of its decision to deny coverage to Jimenez pursuant to the Policy's "illegal acts" exclusion. The company argued that the Policy gave it discretion to interpret the terms of the Policy and to make benefit determinations; accordingly, it asserted that the district court could only overturn its decision to deny Jimenez's claim if its decision was not supported by substantial evidence in the administrative record. Sun Life contended that its decision to deny Jimenez's claim was supported by substantial evidence because ample evidence supported its conclusion that Jimenez's illegal act of DUI contributed to the accident that caused his disability.

Eventually, Jimenez admitted that ERISA governs the Sun Life policy, and he filed a cross-motion for partial summary judgment on the merits of Sun Life's decision to deny his claim for benefits under the Policy and on his request for attorney's fees. He contended that Sun Life had no discretion to interpret the terms of the Policy, thereby requiring the district court to review Sun Life's decision to deny his claim de novo. He also alleged that La. R.S. 22:975 prevented Sun Life from interpreting the Policy's "illegal acts" exclusion to allow it to deny coverage when a claimant's disability was caused by his commission of a misdemeanor.

At the hearing on the cross-motions for summary judgment, the district court announced that it would grant summary judgment for Jimenez on the issue of coverage. The district court subsequently entered a written judgment granting summary judgment for Jimenez on the coverage issue, which the court made final and appealable under Federal Rule of Civil Procedure 54(b). Although the court's judgment does not state the basis for its decision, the court's comments at the hearing reveal that it primarily granted judgment for Jimenez because it found that the application of the "illegal acts" exclusion to Jimenez was inequitable. This appeal followed. 4

## II

On appeal, Sun Life claims that the district court erred by concluding that it improperly denied Jimenez's claim for benefits based on the "illegal acts" exclusion in the Policy. Sun Life contends that the Policy gave it discretion to interpret the terms of the Policy and to determine a claimant's eligibility for benefits. Thus, it asserts that we must review its denial of Jimenez's claim for an abuse of

discretion. It argues that its decision denying Jimenez's claim satisfies the abuse of discretion standard because it was supported by substantial evidence and was not arbitrary and capricious.

[*pg. 4] In response, Jimenez first contends that we should review Sun Life's benefits determination de novo. He also claims that we should apply Louisiana law to decide this case where it is not preempted by ERISA. Jimenez maintains that if we apply Louisiana law, La. R.S. 22:975 requires us to conform the terms of the Policy's "illegal acts" exclusion to the language in the "illegal occupation" clause enumerated at La. R.S. 22:975(B)(9); Jimenez argues that the statutory "illegal occupation" clause only allows insurers to deny coverage for losses caused by felonies. He contends that because there is no evidence that felonious conduct contributed to Jimenez's injuries, Sun Life improperly denied coverage under the "illegal acts" exclusion of the policy.

## A

"This Court reviews summary judgments *de novo* in ERISA cases, applying the same standards as the district court." *Corry v. Liberty Life Assurance Co. of Boston,* 499 F.3d 389, 397 (5th Cir.2007) (citation omitted). The district court rendered judgment for Jimenez on cross-motions for summary judgment; accordingly, we will review "the motions ... independently, with evidence and inferences taken in the light most favorable to the nonmoving party." *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin,* 420 F.3d 366, 370 (5th Cir.2005) (citation omitted). Here, the basis for the district court's decision to grant summary judgment for Jimenez was not entirely clear. However, "[e]ven if we do not agree with the reasons given by the district court to support summary judgment, we may affirm the district court's ruling on any grounds supported by the record." *Lifecare Hosps., Inc. v. Health Plus of La., Inc.,* 418 F.3d 436, 439 (5th Cir.2005).

If Sun Life had discretionary authority to construe the terms of the Policy and to determine a claimant's eligibility for benefits, we will review its interpretation of the Policy's terms and its decision to deny Jimenez's claim for benefits under an abuse of discretion standard. *See Corry,* 499 F.3d at 397. Sun Life contends that we should review its determinations for an abuse of discretion because the Policy gives it the discretionary authority to "make all final determinations regarding claims for benefits under the benefit plan insured by this Policy," including the discretionary authority to "determin[e] eligibility for benefits" and to "construe the terms of this Policy." The Policy also states that "[a]ny court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves Sun Life's determinations are arbitrary and capricious."

Jimenez counters that we should review Sun Life's decision to deny Jimenez's claim de novo because the Policy itself could not grant any discretionary authority to Sun Life. He notes that the terms of the Policy frame Sun Life's discretionary authority as a delegation of authority from the Plan Administrator-Smith International; the Policy provides that "[t]he Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy." Accordingly, he contends that Smith International needed

to first reserve discretionary authority to itself in a written instrument before it could grant any discretionary authority to Sun Life in the Policy. We disagree.

**[\*pg. 5]** Jimenez has conceded that ERISA governs his claims under the Policy even though there is no written document designated as "the Plan." Accordingly, even without a formal written "Plan," we must assume that Smith International had an intent to "provide its employees with a welfare benefit program through the purchase and maintenance of a group insurance policy." *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 241 (5th Cir.1990); *see id.* at 241 & n. 5 (holding that a company's purchase and maintenance of a group insurance policy established the existence of an ERISA plan even though there was no "formal document designated as 'the Plan' "); *see also Shearer v. Sw. Serv. Life Ins. Co.,* 516 F.3d 276, 279 (5th Cir.2008) ("We have stated that 'the purchase [of insurance] is evidence of the establishment of a plan, fund, or program' and that 'the purchase of a policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established.' " (alteration in original) (citation omitted)).

Moreover, even though the Policy would have more clearly granted discretionary authority to Sun Life if the grant had not been couched as a transfer of Smith International's discretion, the Policy nevertheless unambiguously granted Sun Life discretion to interpret the terms of the Policy and to determine a claimant's eligibility for benefits. *See Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 637 (5th Cir.1992) ("Although the expression of the ... plan administrator's discretionary authority to determine eligibility may not be as obvious as in some of the cases where we have found similar discretion, we are satisfied that, taken as a whole, [the plan] expresses the discretion of the plan administrator to determine eligibility."). We have declined to adopt a formal approach when determining whether an ERISA plan grants discretionary authority to a plan administrator, and we see no reason to do so here where a group insurance policy (1) establishes the existence of an ERISA plan and (2) clearly grants discretion to the Plan's claims fiduciary. *See id.* (" '[T]he Court in *Firestone* surely did not suggest that 'discretionary authority' hinges on incantation of the word 'discretion' or any other 'magic word.' Rather, the Supreme Court directed lower courts to focus on the breadth of the administrators' power-their 'authority to determine eligibility for benefits or to construe the terms of the plan.' " (citations omitted)).

Here, the Policy expressly gave Sun Life discretionary authority (1) regarding "the determination of eligibility for benefits" and (2) to "construe the terms of this policy." Moreover, the Policy provided that "[a]ny court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves Sun Life's determinations are arbitrary and capricious." Thus, we conclude that the language in the Policy sufficiently demonstrated an intent to grant Sun Life discretion to construe the terms of the Policy and to determine eligibility for benefits. *See id.* (holding that the language of a plan, "taken as a whole, ... expresse[d] the discretion of the plan administrator to determine eligibility"). Accordingly, we review Sun Life's interpretation of the Policy's terms and its decision to deny Jimenez's claim for an abuse of discretion. *Id.* at 636 (holding that "[i]f the administrator has discretionary authority, a reviewing court applies an abuse of discretion standard").

**B**

[*pg. 6] Before deciding whether substantial evidence supported Sun Life's decision to deny Jimenez's claim, we must first decide whether the laws of Texas or Louisiana govern the Policy to the extent that state law is not preempted by ERISA. "ERISA preempts 'all State laws insofar as they ... relate to any employee benefit plan.' " *Gahn v. Allstate Life Ins. Co.,* 926 F.2d 1449, 1453 (5th Cir .1991) (alteration in original) (citing **29 U.S.C. § 1144(a)** ). "However, in what has come to be known as the 'savings clause,' Congress stated that ERISA was not intended to supersede State laws which 'regulate [ ] insurance.' " *Id.* (alteration in original) (quoting **29 U.S.C. § 1144(b)(2)(A)** ).

Sun Life contends that we should apply Texas law where it is not preempted by ERISA. It asks us to enforce the choice of law provision contained in the policy, which states that "[t]his Policy is delivered in Texas and is subject to the laws of that jurisdiction." In support, it cites two cases from our sister circuits in which the courts enforced similarly worded choice of law provisions in ERISA cases. *See Greenberg v. Aetna Life Ins. Co.,* 421 F. App'x 124, 125 (2d Cir.2011) (unpublished); *Fenberg v. Cowden Auto. Long Term Disability Plan,* 259 F. App'x 958, 959 (9th Cir.2007) (unpublished). Sun Life also argues that applying Louisiana law to this dispute merely because it is the forum state would undercut ERISA's objectives by undermining the uniform interpretation of the same plan across states. *See Conkright v. Fromert,* 130 S. Ct 1640, 1651 (2010) ("Uniformity is impossible, however, if plans are subject to different legal obligations in different States." (citation and internal quotation marks omitted)).

Jimenez counters that the Policy's choice of law provision "is immaterial because [La. R.S. 22:975] is the embodied public policy of the State of Louisiana and is mandatory to all insurance policies which apply to insureds who reside in Louisiana." That is, he claims that La. R.S. 22:975 prohibits the Policy from containing a term that would exclude from coverage a loss suffered by Jimenez that was caused by his commission of a non-felony. Further, he asserts that he is a Louisiana resident, that he was employed in Louisiana, and that the accident occurred in Louisiana. He also contends that the Policy's choice of law provision is not valid because "it does not state what law applies in the event of litigation." Lastly, at oral argument and in a subsequent Federal Rule of Appellate Procedure 28(j) letter, Jimenez asserted that La. R.S. 22:868 "invalidates Sun Life's choice of laws argument." **5** La. R.S. 22:868(B) provides in relevant part that

No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state, or any group health and accident policy insuring a resident of this state regardless of where made or delivered, shall contain any condition, stipulation, or agreement:

[*pg. 7] (1) Requiring it to be construed according to the laws of any other state or country except [for an irrelevant exception].

Jimenez argues, without citing any authority, that La. R.S. 22:868 "prohibits clauses with a choice of law other than Louisiana in insurance policies which apply in Louisiana to a Louisiana resident."

We review choice of law issues de novo. *In re Mirant Corp.,* 675 F.3d 530, 533 (5th Cir.2012). We have not previously addressed how we should decide residual choice of law disputes in the ERISA context. However, we have held that we should apply federal common law choice of law principles when we exercise federal question jurisdiction over a case. *See Haynsworth v. The Corporation,* 121 F.3d 956, 962 (5th Cir.2009) (holding, in one of two consolidated cases where jurisdiction was partly based on the presence of a federal question, that "[f]ederal law applies to the [forum selection/choice of law clause] enforceability determination"); *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.,* 585 F.3d 236, 241-42 (5th Cir.2009) (holding that we must apply general federal maritime choice of law rules when sitting in admiralty); *see also Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 809 (5th Cir.2009) (Owen, J., dissenting) (en banc) (noting that "circuit courts have concluded that a federal common law choice-of-law analysis should be conducted when the issue is a federal question"). Accordingly, we will apply federal common law choice of law principles to decide whether Texas or Louisiana law governs the Policy to the extent that state law is not preempted by ERISA. *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden,* 448 F.3d 918, 922 (6th Cir.2006) ("In determining which state's law applies in an ERISA case, this court's 'analysis is governed by the choice of law principles derived from federal common law.' " (citation omitted)).

Here, the Policy contained a valid choice of law provision, which indicates that the parties intended for the Policy to be governed by Texas law to the extent that it is not preempted by ERISA. Thus, in order to decide this issue, we must ascertain how to determine whether or not to enforce an ERISA plan's choice of law clause in accordance with federal common law. Although we have not previously addressed this issue, a review of our caselaw in other federal question cases and of caselaw from our sister circuits in ERISA cases reveals three possible approaches to resolving this choice of law issue.

First, our sister circuits have applied two different tests when deciding whether to enforce an ERISA plan's residual choice of law clause. Two of our sister circuits have held that "[w]here a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair." *Wang Labs., Inc. v.. Kagan,* 990 F.2d 1126, 1128-29 (9th Cir.1993); *Buce v. Allianz Life Ins. Co.,* 247 F.3d 1133, 1149 (11th Cir.2001). By contrast, the Sixth Circuit has applied the Restatement (Second) of Conflict of Laws to decide whether to give effect to a choice of law provision in an ERISA plan; it applied the Restatement because it found an "absence of any established body of federal choice of law rules." *Durden,* 448 F.3d at 922 (citation omitted). Specifically, the court applied § 187 of the Restatement, which addresses when to apply the law of the state chosen by the parties. *Id.* at 922-23.

**[\*pg. 8]** We have likewise generally referred to the Restatement when deciding choice of law issues in some admiralty cases, *see Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 891 (5th Cir.1991), and in a recent admiralty case we noted that § 187 supported our decision to enforce an insurance policy's choice of law clause. We described § 187 thusly:

Generally speaking, under section 187(1) the law of the jurisdiction chosen by the parties will be applied to the issue in question if the parties could have resolved the issue by an explicit provision in their agreement directed to that issue. Even if that is not the case, the law of the chosen jurisdiction will

still apply unless either of conditions (a) and (b) following is met, *viz* (a) the chosen state has no substantial relationship to the parties or the transaction, and "there is no other reasonable basis for the parties' choice," or (b) the application of the chosen state's law "would be contrary to a fundamental policy of a state" whose law would be the applicable law determined under the section 188 analysis in the absence of an effective choice of law by the parties.

*Durham Auctions, Inc.,* 585 F.3d at 242 (citation omitted).

We have also employed a similar test when deciding whether to enforce forum selection and choice of law clauses in cases involving international disputes. *See Haynsworth,* 121 F.3d at 962-63. Under this test, we presumptively enforce a valid forum selection and choice of law clause; however, the party seeking to avoid enforcement of the clause can overcome the presumption "by a clear showing that the clause is unreasonable under the circumstances." *Id.* at 963 (citation and internal quotation marks omitted).

We need not decide among these competing standards to resolve this case, however, because we conclude that Jimenez has failed to satisfy his burden to establish that we should not enforce the Policy's choice of law clause under any standard we would adopt. *See In re Southmark Corp.,* 95 F.3d 53, 1996 WL 459958, at[*pg. 3] n. 7 (5th Cir. July 26, 1996) (per curiam) (unpublished) ( "Neither party has adequately briefed the potentially complex choice of law issues presented by the facts of this case."). Under any of these standards we would employ to decide this issue, Jimenez bears the burden of establishing that we should not enforce the Policy's choice of law provision. *See Haynsworth,* 121 F.3d at 963 (requiring the party opposing enforcement of a choice of law clause to make a clear showing that the clause was unreasonable under the circumstances); *Kagan,* 990 F.2d at 1129 (holding that a party opposing enforcement of choice of law clause did not "demonstrate that the choice of Massachusetts law is unreasonable or fundamentally unfair"). However, in Jimenez's partial motion for summary judgment and in his brief, he has only claimed that Louisiana law and Texas law treat "illegal act" exclusions differently and that Jimenez lived, worked, and became disabled in Louisiana; he has failed to cite *any* legal authority to support his claim that a difference between Texas and Louisiana law is sufficient to void the Policy's choice of law provision.

[*pg. 9] Specifically, Jimenez has stated that (1) La. R.S. 22:975 prevents insurers in the state from denying coverage on the grounds that a claimant's injury was caused by his own misdemeanor, (2) La. R.S. 22:975 "is the embodied public policy of [Louisiana] and is mandatory to all insurance policies which apply to insureds who reside in Louisiana," and (3) Louisiana was where the accident occurred and where Jimenez lived and worked. Although Jimenez has adequately presented his contention that Louisiana law would not allow Sun Life to deny his claim based on his commission of a misdemeanor, he has not made any legally supported argument concerning how or why a Louisiana statute that allegedly conflicts with Texas law can trump the Policy's valid choice of law clause. **6** In short, Jimenez has failed to argue, much less demonstrate, that enforcing the Policy's choice of law provision would be "unreasonable," "fundamentally unfair," or "contrary to a *fundamental* policy" of Louisiana. Because Jimenez failed to satisfy his burden to establish that the Policy's choice of law provision should not be

enforced, we will apply Texas law to determine this dispute where it is not preempted by ERISA. *See Kagan,* 990 F.2d at 1128 (holding that an ERISA claimant seeking to avoid application of choice of law clause did not "demonstrate that the choice of Massachusetts law is unreasonable or fundamentally unfair"). **7**

## C

Because we have concluded that the Policy gave Sun Life "the discretionary authority to construe the [Policy's] terms and to render benefit decisions," we will reverse Sun Life's denial of benefits to Jimenez "only if it abused its discretion." *Holland v. Int'l Paper Co. Ret. Plan,* 576 F.3d 240, 246 (5th Cir.2009) (citations omitted). Under the abuse of discretion standard, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Ellis v. Liberty Life Assurance Co. of Bos.,* 394 F.3d 262, 273 (5th Cir.2004). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and internal quotation marks omitted). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Holland,* 576 F.3d at 246 (citation and internal quotation marks omitted); *see id.* ("A plan administrator abuses its discretion where the decision is not 'based on evidence, even if disputable, that clearly supports the basis for its denial.' " (citation and internal quotation marks omitted)).

Because Sun Life both evaluates claims for benefits and pays benefits on accepted claims, it had a conflict of interest when it denied Jimenez's claim. *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 112 (2008). Although Sun Life's conflict of interest does not "impl[y] a change in the *standard* of review, say, from deferential to *de novo* review[,]" we must nevertheless "weigh the conflict of interest as a factor in determining whether there is an abuse of discretion in the benefits denial, meaning we take account of several different considerations of which conflict of interest is one." *Holland,* 576 F.3d at 247 (alteration in original) (citations and internal quotation marks omitted).

**[\*pg. 10]** After reviewing the administrative record, we conclude (1) that Sun Life's interpretation of the policy's terms was reasonable and (2) that substantial evidence supported its decision to deny Sun Life's claim for benefits.

As an initial matter, Sun Life reasonably interpreted the terms of the Policy. Sun Life interpreted the Policy's "illegal acts" exclusion to allow it to deny coverage when a claimant's commission of a misdemeanor "contributed" to his injuries. The Policy's "illegal acts" exclusion provides that no coverage will be provided for any disability "that is due to [ ] committing or attempting to commit an assault, felony or other illegal act." Accordingly, Sun Life interpreted the causal language "due to" to only require that an illegal act "contribute" to a claimant's disability. Jimenez has not challenged Sun Life's interpretation of this causation requirement, so, as we will discuss more fully below, we assume that its interpretation was reasonable. *See Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1100 (10th

Cir.1999) (holding that "due to" is an ambiguous causal term and that ERISA plan administrator had discretion to give the phrase multiple reasonable interpretations).

However, Jimenez does challenge Sun Life's interpretation of the phrase "illegal acts." He argues that the scope of activity encompassed by the Policy's reference to "illegal acts" is ambiguous; accordingly, he contends that we should employ the "rules of *contra proferentum* and *ejusdem generis* " to interpret the meaning of the term. *See High v. E-Systems Inc.,* 459 F.3d 573, 578-79 (5th Cir.2006) (holding that we only employ the rule of *contra proferentum* when a term is ambiguous); *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 219 (5th Cir.2007) (holding that the canon *ejusdem generis* applies only when a term is ambiguous).

But even if we assume that the phrase "illegal acts" is ambiguous as used in the Policy exclusion, Sun Life has discretion to reasonably resolve any ambiguities in the Policy's terms. *See Conkright,* 130 S.Ct. at 1651 (holding that "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable' " (citation omitted)); *High,* 459 F.3d at 578-79 (holding that a plan administrator had discretion to resolve ambiguities in a plan, "exercising its 'interpretive discretion' " (citation omitted)). Sun Life had discretion to interpret the Policy's terms, and it reasonably interpreted the phrase "illegal acts" to include misdemeanors; accordingly, we conclude that Sun Life's interpretation of the Policy's terms was reasonable. *Holland,* 576 F.3d at 246.

Further, we conclude that substantial evidence in the administrative record supports Sun Life's determinations (1) that Jimenez committed a DUI offense and (2) that his disability was "due to" his DUI offense. *See Corry,* 499 F.3d at 397-98 (holding that a plan fiduciary does not abuse its discretion if its decision "is supported by substantial evidence and is not arbitrary and capricious" (citation omitted)).

**[\*pg. 11]** First, substantial evidence supports Sun Life's determination that Jimenez was committing a DUI offense at the time of the accident. According to Louisiana's crime lab, Jimenez had a BAC of nearly twice the legal limit-0.15-when his blood was drawn at the hospital. Further, the police officer who arrived at the scene suspected that alcohol was involved in the accident, and the hospital staff recorded that Jimenez was "intoxicated" when he was admitted. Moreover, Sun Life's medical expert examined Jimenez's medical records and opined that it was reasonable to conclude that he had a BAC over the legal limit at the time of the accident. Lastly, Jimenez has been indicted for DUI and for careless operation of a motor vehicle. Even though Jimenez had not been convicted of the DUI offense when Sun Life denied his claim, Sun Life still based its decision on relevant evidence that "a reasonable mind might accept as adequate to support" its conclusion that Jimenez was committing a DUI offense at the time of the accident. *Corry,* 499 F.3d at 398 (citation and internal quotation marks omitted); *see James v. La. Laborers Health and Welfare Fund,* 29 F.3d 1029, 1034 (5th Cir.1994) (holding that a claim fiduciary properly denied coverage on the grounds that a loss was sustained in the course of the commission of a felony even though the underlying felony had not been prosecuted). **8**

Second, we conclude that substantial evidence supports Sun Life's determination that Jimenez's disability was "due to" his alleged DUI offense. Jimenez contends that his alleged DUI offense did not

cause his disability because the accident occurred when he was forced off the road to avoid two racing cars. *Cf. Carter v. Sun Life Assurance Co.,* No. 05-2214, 2006 WL 1328821, at[*pg. 9] (E.D.La. May 11, 2006) (holding that an insured's loss resulted from the criminal act of DWI, in part, because there was "no evidence in the record to suggest another possible cause of the crash"). However, even if there were two racing cars that forced Jimenez off the road, thereby proximately causing the accident, Sun Life had discretion to interpret the Policy's terms not to require Jimenez's illegal act to be the sole cause of his injuries. *See High,* 459 F.3d at 579 (holding that when a plan administrator has discretion to interpret a plan's terms, it has the authority to reasonably interpret ambiguous terms in the plan). Put another way, in order for a disability to be "due to" the commission of an "illegal act," the "illegal act" does not necessarily have to be the sole cause of the disability. *See Kimber,* 196 F.3d at 1100 (holding in an ERISA case that the phrase "due to" was ambiguous and deferring to the plan administrator's reasonable interpretation of the phrase, which required only a "significant relationship" between a condition and a disability). Jimenez has not challenged Sun Life's interpretation of the causal language in the "illegal acts" exclusion, so we conclude that Sun Life reasonably interpreted "due to" to mean that an illegal act "contributed" to a claimant's disability. *See id.* ("The causal nexus of 'due to' has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other." (citation omitted)).

[*pg. 12] Lastly, we conclude that substantial evidence supports Sun Life's determination that Jimenez's alleged DUI offense "contributed" to the accident that caused his disability. Here, Jimenez's vehicle traveled over 300 feet after leaving the road, hit several obstructions, and flipped upside down. Further, (1) the responding officer suspected that alcohol was involved in the accident and cited him for careless operation of a motor vehicle; (2) the medical staff who admitted Jimenez into the hospital observed that he was "intoxicated"; and (3) Jimenez had a BAC nearly twice the legal limit when he arrived at the hospital after the accident. In addition, Sun Life procured an expert report suggesting that a person with Jimenez's BAC at the time of the accident would be expected to suffer from impaired reflexes, reaction time, and gross motor control. Jimenez was also indicted for careless operation of a motor vehicle, which further indicates that a reasonable person could conclude that his "illegal acts" contributed to the accident.

Under these circumstances, we conclude that Sun Life based its decision on relevant evidence that "a reasonable mind might accept as adequate to support" its conclusion that Jimenez's alleged DUI offense "contributed" to the accident that caused his disability. *Corry,* 499 F.3d at 398 (citation and internal quotation marks omitted); *see Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.,* 573 F.3d 210, 214 (5th Cir.2009) (holding that a plan administrator's conclusion that drugs in a pilot's system caused a plane crash was not unreasonable, in part, due to the nature of the accident and the difficulty of obtaining direct evidence that drugs cause a crash).

Accordingly, we conclude that Sun Life did not abuse its discretion by denying Jimenez's claim for disability benefits under the Policy. *Holland,* 576 F.3d at 251 ("Overall, considering the potential conflict of interest as a minimal factor, the evidence is more than sufficient to support the Plan Administrator's

exercise of its discretion against the challenges raised by Holland.").

## III

For the foregoing reasons, we REVERSE and RENDER judgment for Sun Life on the issue of coverage. We REMAND to the district court for further proceedings consistent with this opinion.

C.A.5 (La.),2012.

Jimenez v. Sun Life Assur. Co. of Canada

Slip Copy, 2012 WL 3495259 (C.A.5 (La.))


* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1 An independent witness gave a voluntary statement to police confirming the fact that two vehicles had raced down the relevant street around the time of the accident.

2 In this initial denial letter, Sun Life erroneously stated that Jimenez's BAC was .287; the error apparently resulted from a notation in Jimenez's medical records.

3 In the months preceding Jimenez's indictment, a claims service provider retained by Sun Life placed several calls to the local police department, district attorney's office, crime lab, and Lafayette Parish courthouse. In those calls, the claims service provider inquired about the status of the pending criminal charges against Jimenez and attempted to assist the various law enforcement agencies share information with each other.

4 Before the court rendered its Rule 54(b) judgment, Sun Life filed a partial motion to dismiss Jimenez's amended complaint under Rule 12(b)(6). Specifically, it contended that his claim for penalties under ERISA and his "abuse of process" and "interference with contract" claims under Louisiana law were preempted by ERISA. After Sun Life filed its notice of appeal from the district court's Rule 54(b) judgment, the court denied Sun Life's pending motion to dismiss. The court concluded that the majority of Sun Life's arguments had been decided in the court's summary judgment, rendering those arguments moot in the motion to dismiss, "including the issues of penalties, damages, and claims against the individual defendants."

5 Jimenez's Rule 28(j) letter actually refers to La. R.S. 22:898, a provision that no longer exists.

However, Jimenez attached a copy of La. R.S. 22:868 to his Rule 28(j) letter, and his counsel read from La. R.S. 22:868 at oral argument. Thus, we assume that he meant to refer to La. R.S. 22:868.

**6** By referring to the "public policy" of Louisiana, Jimenez may have been making an argument under Louisiana choice of law principles. *See* La. Civ.Code Ann. art. 3540 ("All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537."). However, because Jimenez failed to cite any authority to support his argument, we cannot definitively conclude that Jimenez was making an argument under Louisiana choice of law principles.

In his Rule 28(j) letter, Jimenez also referred to a Louisiana statute, which provides that no group accident policy insuring a resident of Louisiana "regardless of where made or delivered, shall contain any [choice of law provision] [r]equiring it to be construed according to the laws of any other state or country." *See* La. R.S. 22:868(B). However, even if we were to consider this statute despite the fact that Jimenez failed to mention it in the administrative proceedings, in the district court, or in his brief, Jimenez also has failed to cite any authority suggesting how or why this Louisiana statute can trump the Policy's valid choice of law clause. Instead, he has again merely pointed out a difference between Louisiana and Texas law without saying why that difference voids the Policy's choice of law provision. *See also Thomas v. Reliance Standard Life Ins. Co.,* 136 F.3d 138, 1998 WL 30108, at[\*pg. 3] (5th Cir. Jan. 15, 1998) (holding that even if we assumed that the predecessor to La. R.S. 22:868 voided a group ERISA plan's choice of law provision, the claimant had not raised a fact issue regarding whether the policy was issued and delivered in Massachusetts); *cf. Kadan v. Commercial Ins. Co.,* 800 F.Supp. 1392, 1395 (E.D.La.1992) (voiding choice of law provision in non-ERISA case under the predecessor to La. R.S. 22:868 after employing Louisiana choice of law principles).

**7** Because Jimenez has not challenged Sun Life's characterization of Texas law, we will assume that Sun Life has accurately described Texas law.

**8** Jimenez contends that Sun Life denied his claim after its statutory deadline for deciding Jimenez's administrative appeal. He thus asserts that Sun Life could not base its decision on information acquired after its statutory deadline. But Jimenez cites no authority to support his claim that Sun Life could not consider evidence acquired after its statutory deadline had expired. Accordingly, we will consider all of the evidence contained in the administrative record. *See Estate of Bratton v. Nat'l Union Fire Ins. Co.,* 215 F.3d 516, 521 (5th Cir.2000) ("[T]he administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.").

© 2016 Thomson Reuters/West

© 2016 Thomson Reuters/Tax & Accounting. All Rights Reserved.